UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JEFF TITUS, individually;

    Plaintiff,

-v-

No.
Hon.

MICHAEL WERKEMA, in his
individual capacity; MICHAEL BROWN,
in his individual capacity; jointly and severally,

    Defendants.

---

## COMPLAINT AND JURY DEMAND

NOW COMES the Plaintiff, JEFF TITUS, individually, by and through his attorneys, MUELLER LAW FIRM, by WOLFGANG MUELLER and JOHN WM. MARTIN, JR., and files his Complaint against the Defendants, MICHAEL WERKEMA ("WERKEMA"), in his individual capacity; and MICHAEL BROWN ("BROWN"), in his individual capacity, in this civil action, stating unto this Court as follows:

1. This is an action for damages brought pursuant to 42 U.S.C. §§1983 and 1998, and the Fourteenth Amendment to the United States Constitution against Defendants, Werkema and Brown.

2. Jurisdiction is founded upon 28 U.S.C. §1331.

3. Forum is proper based on the situs of the incident, which occurred in

Kalamazoo County, Michigan.

## GENERAL ALLEGATIONS

4. At all pertinent times Plaintiff, Jeff Titus, was a United States citizen.

5. At all pertinent times, Defendant, Werkema, was employed as a Sergeant by the City of Kalamazoo Police Department ("KPD") and was acting within the scope of his employment and under color of law.

6. Werkema, as a sworn police officer, had taken an oath, the Law Enforcement Code of Ethics, that stated in pertinent part: *"As a sworn police officer, my fundamental duty is to serve the community; to safeguard lives and property; to protect the innocent against deception, the weak against oppression or intimidation and the peaceful against violence or disorder; and to respect the constitutional rights of all to liberty, equality and justice."*

7. At all pertinent times, Defendant, Brown, was employed as a Sergeant by the Kalamazoo County Sheriff's Office ("KCSO") and was acting within the scope of his employment and under color of law.

8. Brown, as a sworn police officer, had taken an oath, the Law Enforcement Code of Ethics, that stated in pertinent part: *"As a sworn police officer, my fundamental duty is to serve the community; to safeguard lives and property; to protect the innocent against deception, the weak against oppression or intimidation and the peaceful against violence or disorder; and to respect the*

*constitutional rights of all to liberty, equality and justice."*

## GENERAL ALLEGATIONS

9. On November 17, 1990, at approximately 4:30 p.m. – 5:00 p.m., two hunters, Doug Estes and Jim Bennett, were shot at close range and killed while hunting in the Fulton State Game Area ("FGA") in Fulton, Michigan, in Kalamazoo County.

10. Two witnesses, Helen Nofz, and her son, Derek Nofz, came upon a man whose vehicle was stuck in a ditch at Y Avenue and 46th Street, near the murder scene, shortly after a series of gunshots was heard. They told police of their encounter and helped develop an artist's composite sketch of the man. They also described the vehicle, believing it to be similar to a Dodge Shadow.

11. In 1993, Helen Nofz and her son travelled to Ohio at Kalamazoo County Sheriff's Office Det. Bruce Wiersma's request to view a physical lineup involving a suspect in several murders in Ohio and a suspect in the Bennett/Estes murders. They both affirmatively identified Thomas Dillon as the person they saw with the car in the ditch shortly after the Bennett/Estes murders.

12. Det. Wiersma collected materials on Thomas Dillon as a suspect in the Bennett/Estes murders and placed them in the homicide file.

13. Wiersma and Det. Roy Ballett mistakenly ruled out Dillon as a suspect because they didn't believe he could have travelled from Ravenna, Ohio, to

3

the Fulton Game Area in time to commit the murders.

14.     Plaintiff, who owned land adjacent to the FGA, was considered a suspect by Wiersma and Ballett.

15.     Plaintiff was eliminated as a suspect when he passed a polygraph examination and had a confirmed alibi, namely, that he was hunting 27 miles away at the time of the murders.

16.     A woman, Bonnie Huffman, told police that while hunting, she came upon the man whose car was stuck in the ditch. She then went home. Sometime later, when it was dark, approximately 8:00 – 9:00 p.m., Jeff Titus came to her house and told her and her parents of the discovery of the dead hunters in the Fulton State Park adjacent to his property.

17.     The case languished as a cold case until a newly formed KCSO Cold Case Unit took it over in approximately 2000. The Cold Case Unit was led by Officer-in-Charge, Werkema, and included Brown, a representative of the Kalamazoo County Sheriff's Office.

18.     Having no new evidence, Werkema and Brown focused on Titus as the suspect in the murder. Brown considered Titus the prime suspect immediately upon review of the file.

19.     Having reviewed the Bennett/Estes murder file before presenting it to the Cold Case Team, Brown was aware of the folder containing information about

a serial killer in Ohio, Thomas Dillon, and that he had been identified by Helen and Derek Nofz, as being the man stuck in the ditch. Brown was also aware of the remaining Thomas Dillon materials in the file.

20. Brown made a copy of the file for Werkema, head of the Cold Case Team. Thus, Werkema was aware of the Thomas Dillon file materials, including the identification made by Helen and Derek Nofz.

21. During the renewed investigation, Werkema was able to convince Bonnie Huffman to change her story concerning the time at which Jeff Titus came to her house. Instead of being 8:00 – 9:00 p.m., as she had reported at the time of the murders, she now claimed (and later testified at trial) that Titus came to her house at dusk, because she stopped hunting before dark. Her new story would place Titus in the area of the crime shortly after it occurred, instead of 27 miles away, where he had always claimed he was hunting on the day of the murders.

22. Despite there being no physical evidence or eyewitnesses connecting Plaintiff to the crime, Werkema wrote a Warrant Request, which was approved by the prosecutor's office and signed by a judge. Plaintiff was then arrested and charged with two counts of first-degree murder.

23. As further evidence that Werkema would not entertain any objections to his focus on Plaintiff as the sole suspect, he dismissed Cold Case team member, Det. Richard Mattison, from the team because Mattison believed the physical

5

evidence suggested the presence of two shooters, not one.

24.   Werkema did not disclose to the trial prosecutor that Richard Mattison believed there were two shooters involved and that he was kicked off the Cold Case team because he voiced objection to the theory that Plaintiff was the sole shooter.

25.   At trial, the prosecutor paraded a series of witnesses who testified that he had made threats of violence to people he believed to be trespassing on his land.

26.   The prosecutor also presented Bonnie Huffman, who testified at trial that Plaintiff visited her parents' house at approximately 5:15 p.m. that day. The time fit the prosecution's timeline that Plaintiff was near the crime scene around the time of the crime.

27.   The prosecutor presented the following astounding motive and crime scene scenario: Plaintiff was an overzealous protector of his property and, while hunting with his friend all day 27 miles away, suddenly decided around 4:00 p.m. that there might be trespassers on his land, so he left the hunting area without telling his hunting buddy, drove 27 miles to his property, encountered two unwitting hunters, shot them each in the back at close range with two different types of ammunition, visited with Bonnie Huffman and her parents, then drove back to the hunting area and picked up his hunting buddy and the deer that Plaintiff had killed that afternoon and returned home, where he discovered the police

adjacent to his property.

28.     On July 19, 2002, following a jury trial in the Kalamazoo County Circuit Court presided over by the Hon. Philip D. Schaefer, Mr. Titus was convicted of two counts of first-degree premeditated murder, MCL 750.316(1)(a), and two counts of felony-firearm, MCL 750.227B-A.

29.     On August 19, 2002, Hon. Philip D. Schaefer sentenced Mr. Titus, a decorated former Marine with no criminal history, to life in prison without parole for the murder counts, with an additional mandatory two years for the felony-firearm counts.

## *BRADY* EVIDENCE WITHHELD FROM THE PROSECUTOR AND TITUS

30.     In June 2020, while being represented by the Michigan Innocence Clinic ("MIC"), MIC Director, David Moran, travelled to Kalamazoo County to review the KCSO homicide file in the Bennett/Estes murder.

31.     During his review of the homicide file, Moran discovered a manilla folder with 30 – 40 pages of documents relating to the KCSO investigation of an identified alternate suspect, Thomas Dillon, a man from Ohio who had plead guilty to the murders of five hunters and fisherman in Ohio committed around the same time as the Bennett/Estes murders.  One of the murders was committed one week before the Bennett/Estes murders and one murder was committed one week later.

32.     The "Dillon" file was never turned over to the Kalamazoo County

Prosecutor's Office.  Thus, the Prosecutor's Office did not turn over the file to Plaintiff's defense counsel.

    33.    The Dillon file contained the following undisclosed evidence:

        a.    A handwritten letter on Grand Traverse County Prosecutor's Office letterhead from "Brian" to "Bruce," dated January 23, 1993, attaching a newspaper article titled, "Is a serial killer putting outdoorsmen in his sights?" and describing several killings attributed to Dillon and specifically mentioned that "investigators are looking at two deaths in lower Michigan in 1990."

        b.    A memo from Craig A. Casey, Deputy Sheriff of the Coshocton County (Ohio) Sheriff's Office, dated February 9, 1993, describing the live lineup procedure in which witnesses, Helen Nofz and her son Derek Nofz, 11, independently identified Thomas Dillon as the man they saw beside the car in the ditch on November 17, 1990.

        c.    An FBI memo from FBI Special Agent, Harry Trombitas, describing the February 9, 1993, lineup in which Helen Nofz and Derek Nofz each "positively identified DILLON as the individual they saw at the vehicle stuck in the ditch."

        d.    A photo of the artist's composite sketch of the man seen by the car in the ditch on November 17, 1990, and a photo of Thomas Dillon, depicting the startling resemblance between Dillon and the sketch.

        e.    FBI notes of a May 7, 1993, interview with federal prisoner, Mike Chappell, who told investigators of a conversation he had with Thomas Dillon while in prison in Lake County, Ohio.  Chappell reported that Dillon confessed that he shot two men (which Dillon called his only "double header"), approximately 30 yards apart, one in the chest, and that no one would be able to prove he was even in the county at the time of the murders.

Case 1:23-cv-00997  ECF No. 1,  PageID.9  Filed 09/19/23  Page 9 of 15

    f.    Memos from interviews with two of Dillon's co-workers, each of whom reported to police that in the week before November 17, 1990, Dillon had asked to borrow a shotgun from each man, telling them he was going hunting on November 17. He later returned each man's shotgun and told each man that he bagged a deer with the man's shotgun. Dillon told one man, Charles Shaffer, who had given him a slug barrel and a bird shot barrel, that his wife had inadvertently thrown away the bird shot barrel while cleaning the house.

    g.    A KCSO Cold Case memo from Det. Gwen Romanak, dated May 2, 2002, describing an interview with Helen Nofz in which she describes going to Ohio at the request of Det. Wiersma to look at a lineup and that Nofz picked out a person in the lineup (Dillon) that she said looked most like the person in the ditch. She also told Romanak that she had known Plaintiff since high school.

34.    Plaintiff's case was ultimately reviewed by the Michigan Attorney General's Office Conviction Integrity Unit and the Criminal Trials and Appeals Division.

35.    Based on its investigation, the Michigan Attorney General's Office stipulated to entry of an unconditional writ of habeas corpus and order for a new trial based on the egregious *Brady* violations.

36.    The Stipulation, filed on February 22, 2023, stated, in pertinent part:

    a.    The CIU ultimately collected and confirmed a variety of relevant and material information identifying Dillon as a suspect.

    b.    The FBI had conducted surveillance of Thomas Dillon and documented occasions when Dillon would drive hundreds of miles from home.

9

  c. Dillon picked up his shell casings and left no evidence at any of his homicide scenes.

  d. The CIU investigation discovered that the man seen in the ditch, identified as Dillon, told Ms. Nofz that he was driving his wife's car.

  e. The Kalamazoo County Prosecutor's Office file did not contain any of the documents relating to Thomas Dillon.

37. The parties further stipulated that the suppressed evidence was material and that the State's failure to turn over to the defense the evidence about Thomas Dillon violated *Brady v. Maryland*, 373 U.S. 83 (1963).

38. On June 1, 2023, Kalamazoo County Prosecutor, Jeffrey Getting, agreed to dismiss criminal charges against Plaintiff, noting that the failure to turn over exculpatory evidence resulted in a trial that was "fundamentally flawed. The conviction was not fair or just."

39. From the date of his arrest on December 12, 2001, to June 1, 2023, when criminal charges were finally dismissed by the Kalamazoo County Prosecutor's Office, Jeff Titus had been seized and/or incarcerated for a total of **7,842 days**, or 21 years, 5 months, and 21 days.

40. Due to the conduct of Defendants, Werkema and Brown, as set forth herein, Plaintiff, Jeff Titus, suffered the following injuries and damages:

  a. Suffering a deprivation of liberty by being wrongfully arrested, jailed, incarcerated, and imprisoned for a period of over 21.5 years;

10

b. Severe emotional distress for the period from his arrest to the present, including, but not limited to: the emotional distress of being charged with first-degree murder and felony-firearm, facing a sentence of life in prison without the possibility of parole; and being wrongfully convicted of crimes the Defendants knew he did not commit;

c. Physical manifestations of emotional distress including, but not limited to, sleeplessness, irritability, loss of appetite, headaches, and other symptoms;

d. Fright, shock, indignity, humiliation, outrage, and embarrassment of being wrongfully charged and imprisoned for murder;

e. Loss of enjoyment of daily activities;

f. Not being able to attend the funerals of several family members;

g. Physical injuries suffered in prison;

h. Loss of employment opportunity, past income, and future earning capacity, as well as pension benefits;

i. Restricted and/or complete loss of all forms of personal freedom and physical liberty, including but not limited to diet, sleep, personal contact, educational opportunity, vocational opportunity, personal fulfillment, sexual activity, family relations, recreational activities, and personal expression;

j. Many of Plaintiff's injuries and damages are likely to be permanent;

k. Other damages which may be revealed through discovery.

# COUNT I

## 14TH AMENDMENT DUE PROCESS
## *"BRADY"* VIOLATIONS BY DEFENDANTS

41. Plaintiff incorporates by reference each preceding paragraph as if fully stated herein.

42. At all times, Plaintiff had a constitutional right, secured by the 14th Amendment, not to be deprived of due process resulting from the withholding of material exculpatory or impeachment evidence by a government officer.

43. Defendants did not disclose material exculpatory and impeachment evidence in their files, including the Thomas Dillon evidence. Their failure to disclose the evidence to the prosecutor violated their constitutional obligation under *Brady v Maryland*, 373 US 83 (1963) and its progeny, resulting in an unfair trial.

44. Plaintiff's right to *Brady* evidence, and the police officers' constitutional duty to turn over material and apparent *"Brady"* evidence, was clearly established before July 2002, when Plaintiff was tried and convicted. *See Jamieson v. Bies,* 291 F.3d 380, 388 (6th Cir. 2014) (in 1985, it was clearly established that the state had a duty to disclose evidence of identifiable alternate suspects); *Jackson v. City of Cleveland*, 925 F.3d 793 (6th Cir. 2019) (it was clearly established in 1975 that withholding *Brady* evidence violated a criminal defendant's right to due process).

45. Defendants' due process violations resulted in Plaintiff's wrongful

12

conviction on July 19, 2002, and caused him to be sentenced to life in prison and otherwise seized until criminal charges were dismissed on June 1, 2023.

46. Defendant, Werkema, denies that he was aware of the Thomas Dillon "serial killer" evidence set forth in ¶ 33 at any time before Plaintiff's trial.

47. Defendant, Brown, denies that he was aware of the Thomas Dillon "serial killer" evidence set forth in ¶ 33 at any time before Plaintiff's trial.

## COUNT II

## 14th AMENDMENT CIVIL CONSPIRACY BY DEFENDANTS

48. Plaintiff incorporates by reference each preceding paragraph as if fully stated herein.

49. At all times, Plaintiff had a constitutional right, secured by the 14th Amendment, not to be deprived of due process resulting from the withholding of material exculpatory and/or impeachment evidence by a police officer.

50. Upon deciding to open the cold case, Werkema and Brown discussed the evidence in the file. Both men concluded that Plaintiff was guilty of the crime and focused on having him charged with the murders.

51. Upon review of the file, both Defendants were aware of the Thomas Dillon evidence and that it was clearly favorable to the criminal defendant, as it was concrete evidence of a serial killer of hunters who had been identified by Helen Nofz and her son as being the individual stuck in the ditch immediately after

the killings.

52. Werkema and Brown agreed on a single plan to withhold evidence of serial killer, Thomas Dillon, from the prosecutor.

53. In furtherance of the conspiracy, Werkema deliberately withheld the Thomas Dillon evidence from the prosecutor, whom Werkema and Brown knew would disclose the evidence to Plaintiff's criminal defense lawyers, consistent with his ethical and constitutional obligations.

54. Werkema and Brown knew the Thomas Dillon evidence was favorable to Plaintiff and could create reasonable doubt in the minds of jurors.

55. Plaintiff's right to *Brady* evidence, and the police officers' constitutional duty to turn over material and apparent *"Brady"* evidence, was clearly established before July 2000, when Plaintiff was tried and convicted.

## **REQUEST FOR RELIEF**

WHEREFORE, Plaintiff, JEFF TITUS, prays for damages for his wrongful detention and imprisonment, in violation of the Constitution, as set forth above, jointly and severally as to all Defendants, including:

a. Past and future compensatory damages against all Defendants in a minimum amount of Fifty Million Dollars (**$50,000,000.00**);

b. Punitive damages as to Defendant, WERKEMA, in a minimum amount of Twenty-Five Million Dollars (**$25,000,000.00);**

c. Punitive damages as to Defendant, BROWN, in a minimum amount of Twenty-Five Million Dollars (**$25,000,000.00);**

    d. Reasonable attorney fees and costs pursuant to 42 U.S.C. §1988;

    e. The costs and disbursements of this action pursuant to 42 U.S.C. §1920; and,

    f. Such other and further relief as the Court deems just and proper.

Respectfully submitted,

s/Wolfgang Mueller
WOLFGANG MUELLER (P43728)
JOHN WM. MARTIN, JR. (P42266)
MUELLER LAW FIRM
Attorneys for Plaintiff
41850 W. Eleven Mile Road, Ste. 101
Novi, MI 48375
(248) 489-9653
wolf@wolfmuellerlaw.com
john@wolfmuellerlaw.com

Dated: September 19, 2023

## **JURY DEMAND**

Plaintiff, by and through his attorneys, MUELLER LAW FIRM, demands a jury trial in this matter.

Respectfully submitted,

s/Wolfgang Mueller
WOLFGANG MUELLER (P43728)
JOHN WM. MARTIN, JR. (P42266)
MUELLER LAW FIRM
Attorneys for Plaintiff
41850 W. Eleven Mile Road, Ste. 101
Novi, MI 48375
(248) 489-9653
wolf@wolfmuellerlaw.com
john@wolfmuellerlaw.com

Dated: September 19, 2023