UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JEFF TITUS, individually;

       Plaintiff,

-v-                              No.  23-cv-00997
                                   Hon.  Hala Y. Jarbou

MICHAEL WERKEMA, in his
individual capacity; ROBERT H. CINABRO
as Personal Representative of the Estate of
MICHAEL BROWN, in his individual
capacity; jointly and severally,

       Defendants.

---

**PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT
AS TO COUNT I OF PLAINTIFF'S FIRST AMENDED COMPLAINT[1]**

Plaintiff, by and through counsel, moves this Court for an order

GRANTING the instant motion as to Count I, "14th Amendment Due Process

*"Brady"* Violations by Defendants," as to Defendants, Michael Werkema and

Michael Brown.

---

[1]  Plaintiff filed a Motion for Leave to File a Second Amended Complaint on
November 19, 2024.  ECF No. 67.  Defendants responded on December 6, 2024.
ECF No. 74.  Despite the motion having been filed three months ago, and a
dispositive motion cutoff date of March 5, 2025, no hearing date has been set.

Plaintiff relies on the authorities and evidence in the attached Brief in support of his motion.

<div style="margin-left: 40%;">

Respectfully submitted,

s/Wolfgang Mueller
**MUELLER LAW FIRM**
Attorney for Plaintiffs
41850 W. Eleven Mile Road, Ste. 101
Novi, MI 48331
(248) 489-9653
wolf@wolfmuellerlaw.com
(P43728)

</div>

Dated:  May 5, 2025

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JEFF TITUS, individually;

       Plaintiff,

-v-

MICHAEL WERKEMA, in his
individual capacity; ROBERT H. CINABRO
as Personal Representative of the Estate of
MICHAEL BROWN, in his individual
capacity; jointly and severally,

       Defendants.

No.  23-cv-00997
Hon.  Hala Y. Jarbou

---

**BRIEF IN SUPPORT OF PLAINTIFF'S MOTION FOR
PARTIAL SUMMARY JUDGMENT AS TO COUNT I
OF PLAINTIFF'S FIRST AMENDED COMPLAINT [2]**

---

[2]  Plaintiff filed a Motion for Leave to File a Second Amended Complaint on November 19, 2024.  ECF No. 67.  Defendants responded on December 6, 2024. ECF No. 74.  Despite the motion having been filed three months ago, and a dispositive motion cutoff date of March 5, 2025, no hearing date has been set.

# **TABLE OF CONTENTS**

INDEX OF AUTHORITIES......................................................................i

STATEMENT OF ISSUES PRESENTED...............................................v

MOST APPROPRIATE AUTHORITY ...................................................vi

LOCAL RULE CERTIFICATION ......................................................vii

INTRODUCTION ..............................................................................1

PLAINTIFF'S STATEMENT OF UNDISPUTED FACTS ....................2

LEGAL ARGUMENT

I.    SUMMARY JUDGMENT STANDARD.........................................15

II.   DEFENDANTS ARE LIABLE FOR DUE PROCESS *"BRADY"*
      VIOLATIONS (COUNT I).......................................................16

      A.  The *Brady* Doctrine ..................................................16

      B.  Police Must Disclose Evidence of an Identifiable Alternate Suspect .......18

      C.  Police Must Disclose Impeachment Evidence, Especially When it Affects
          the Credibility of a Key Witness .............................................20

      D.  The Evidence Withheld From Plaintiff was Favorable and Material........23

          1.  The Thomas Dillon evidence ............................................24

          2.  The signed Bonnie Huffman statement................................28

      E.  Defendants Withheld the Evidence From the Prosecutor in the Underlying
          Criminal Case, Either Intentionally or Inadvertently ................................30

      F.  Defendants' Defenses Do Not Create a Genuine Issue of Material Fact ..33

III.  DEFENDANTS ARE NOT ENTITLED TO QUALIFIED IMMUNITY ......37

    A.  The Qualified Immunity Doctrine ............................................................37

    B.  Plaintiff's "*Brady* Violation" Due Process Claim was Clearly Established in 2002 ....................................................................................................38

    C.  It was Clearly Established By 2002 That a Police Officer Must Disclose Evidence of an Identifiable Alternate Suspect ..........................................38

    D.  It was Clearly Established By 2002 That a Police Officer Must Disclose Evidence That Will Impeach the Testimony of a Key Witness ................39

REQUEST FOR RELIEF ........................................................................................40

# INDEX OF AUTHORITIES

**FEDERAL CASE(S):**

*Alexander v. CareSource*,
  576 F.3d 5519 (6th Cir. 2009) ............................................................16

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242; 106 S.Ct. 2505 (1986) ..................................................15

*Banks v. Dretke*,
  540 U.S. 668; 124 S.Ct. 1256; 157 L.Ed.2d 1166 (2004).....................23

*Barton v. Warden, Southern Ohio Correctional Facility*,
  786 F.3d 450 (6th Cir. 2015)......................................................... 18, 21

*Bies v. Sheldon*,
  775 F.3d 386 (6th Cir. 2014)......................................................... 19, 23

*Brady v. Maryland*,
  373 U.S. 83; 83 S.Ct.
  1194 (1963) ..................2, 14, 16, 17, 18, 20, 23, 27, 28, 30, 34, 35, 36, 38, 39, 40

*Celotex Corp. v. Catrett*,
  477 U.S. 317; 106 S.Ct 2548 (1986) ...................................................15

*Clark v. Abdallah*,
  131 F.4th 432 (6th Cir. 2025) ..............................................................18

*D'Ambrosio v. Marino*,
  747 F.3d 378 (6th Cir. 2014)......................................................... 17, 30

*D'Ambrosio v. Bagley*,
  527 F.3d 489 (6th Cir. 2008)......................................................... 19, 38

*Giglio v. United States*,
  405 U.S. 150 (1972)............................................................................18

*Gumm v. Mitchell*,
  775 F.3d 345 (6th Cir. 2014)...............................................................20

i

*Harbison v. Bell,*
    408 F.3d 823 (6th Cir.2005)......................................................................... 17, 30

*Harlow v. Fitzgerald,*
    477 U.S. 800; 102 S.Ct. 2727; 73 L.Ed.2d 396 (1982)......................................37

*Harris v. Lafler,*
    553 F.3d 1028 (6th Cir. 2009)............................................. 20, 21, 22, 39

*Hughbanks v. Hudson,*
    2 F.4th 527 (6th Cir. 2021)................................................................ 19, 24

*Jackson v. City of Cleveland,*
    925 F.3d 793 (6th Cir. 2019).................................................................38

*Jamison v. Collins,*
    291 F.3d 380 (6th Cir. 2002)........................................................ 20, 39

*Jefferson v. Lewis,*
    594 F.3d 454 (6th Cir.2010)........................................................ 32, 38

*Jells v. Mitchell,*
    538 F.3d 478 (6th Cir. 2008)...............................................................23

*Kyles v. Whitley,*
    514 U.S. 419; 115 S.Ct. 1555; 131 L.Ed.2d 490 (1995)....................... 19, 20, 24

*Malley v. Briggs,*
    475 U.S. 335; 106 S.Ct. 1092; 89 L.Ed.2d 271 (1986).......................................37

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,*
    475 U.S. 574; 106 S.Ct. 1348 (1986)..................................................15

*McNeill v. Bagley,*
    10 F.4th 588 (6th Cir. 2021)...............................................................23

*Moldowan v. City of Warren,*
    578 F.3d. 351 (6th Cir. 2009)................................. 17, 30, 33, 34, 35, 39

*Mullenix v. Luna*,
   577 U.S. 7; 136 S.Ct. 305; 193 L.Ed.2d 255 (2015).............................................37

*Pearson v. Callahan*,
   555 U.S. 223; 129 S.Ct. 808; 172 L.Ed.2d 565 (2009)........................................37

*Scott v. Henrich*,
   39 F.3d 912 (9th Cir.1994).......................................................................... 32, 38

*Smith Wholesale Co., Inc., v. R.J. Reynolds Tobacco Co.,*
   477 F.3d 854 (6th Cir. 2007)........................................................................16

*Sova v. City of Mt. Pleasant,*
   142 F.3d 898 (6th Cir. 1998).......................................................................38

*Strickler v. Greene,*
   527 U.S. at 282; 119 S.Ct. at 1948........................................................ 17, 23, 39

*Titus v. Jackson,*
   No, 06-10770, 2009 WL 1803209 (E.D. Mich. June 24, 2009) ...........................7

*United States v. Bagley,*
   473 U.S. 667; 105 S.Ct. 3375; 87 L.Ed.2d 481 (1985)..................... 16, 17, 20, 39

*United States v. Castano,*
   906 F.3d 458 (6th Cir. 2018)........................................................................35

*United States v. Clark,*
   928 F.2d 733 (6th Cir. 1991).......................................................................35

*United States v. Jernigan,*
   492 F.3d 1050 (9th Cir. 2007).................................................................. 19, 20, 24

*United States v. Mullins*
   22 F.3d 1365 (6th Cir.1994)........................................................................23

*United States v. Paulus,*
   952 F.3d 717 (6th Cir. 2020)..................................................................... 35, 36

iii

*United States v. Rodriguez*,
    496 F.3d 221 (2d Cir. 2007)...................................................................18

*Virgil v. City of Newport*,
    545 F.3d 444 (E.D. Ky. 2021)...............................................................19

**COURT RULE(S):**

Fed. R. Civ. P. 56(c)(1)(A) .......................................................................15

Fed. R. Civ. P. 56(c)(4)..............................................................................16

Fed.R.Civ.P. 56(c).....................................................................................15

**STATUTE(S):**

42 U.S.C. § 1983.......................................................................................17

## <u>STATEMENT OF ISSUES PRESENTED</u>

I.    WHETHER THE THOMAS DILLON EVIDENCE WOULD HAVE BEEN FAVORABLE TO PLAINTIFF IN HIS CRIMINAL TRIAL.

      Plaintiff responds "Yes."

      Defendants respond "No."


II.   WHETHER THE SIGNED BONNIE HUFFMAN STATEMENT WOULD HAVE BEEN FAVORABLE IMPEACHMENT EVIDENCE IN PLAINTIFF'S CRIMINAL TRIAL.

      Plaintiff responds "Yes."

      Defendants respond "No."


III.  WHETHER THE THOMAS DILLON AND BONNIE HUFFMAN EVIDENCE, WHEN VIEWED CUMULATIVELY FOR *BRADY* PURPOSES, WAS MATERIAL.

      Plaintiff responds "Yes."

      Defendants respond "No."


IV.   WHETHER DEFENDANTS DISCLOSED THE ALLEGED *BRADY* EVIDENCE TO THE PROSECUTOR BEFORE TRIAL, THUS FULFILLING THEIR *BRADY* OBLIGATIONS.

      Plaintiff responds "No."

      Defendants respond "Yes."

## <u>MOST APPROPRIATE AUTHORITY</u>

### <u>*BRADY* OBLIGATIONS OF POLICE</u>

### *Moldowan v. City of Warren,* 578 F.3d 351 (6th Cir. 2009)

"[B]ecause the police are just as much an arm of the state as the prosecutor, they inflict the same constitutional injury when they hide, conceal, destroy, withhold, or even fail to disclose material exculpatory evidence." *Id.* at 381.  The Court also noted ("Where the exculpatory value of a piece of evidence is 'apparent,' the police have an *unwavering* constitutional duty to preserve and ultimately disclose that evidence.  The failure to fulfill that obligation constitutes a due process violation regardless of whether a criminal defendant or § 1983 plaintiff can show that the evidence was destroyed or concealed in 'bad faith.' "). *Id.* at 388 (emphasis in original).

"The reason no *further* showing of animus or bad faith is required is that where police have in their possession evidence that they know or should know might be expected to play a significant role in the suspect's defense the destruction or concealment of that evidence can *never* be done in good faith and in accord with their normal practice." *Id.* at 388-89 (internal citations and quotations omitted) (emphasis in original).

## <u>LOCAL RULE CERTIFICATION</u>

I, Wolfgang Mueller, certify that this document complies with LCivR.

7.2(b)(1).  Plaintiff's counsel uses Microsoft Word for Office 365 and the word

count as defined in LCivR. 7.2(b)(1) is 9,852 words.

## <u>INTRODUCTION</u>

This is a wrongful conviction case arising out of Plaintiff, Jeff Titus', 2002 first-degree murder conviction in the November 17, 1990, murders of James Bennett and Doug Estes at the Fulton State Game Area ("FGA"). **(O.T.I.S., Jeff Titus, Exhibit 1)**.  Mr. Titus was convicted and sentenced to life in prison without the possibility of parole, based only on circumstantial evidence, despite a complete absence of physical evidence, eyewitness testimony, or a confession.

In 2020, David Moran, Plaintiff's attorney with the Michigan Innocence Clinic, discovered a manilla folder in the Kalamazoo County Sheriff's Office file for the Jeff Titus case labelled "Serial Killer."  The folder contained approximately 40 pages of documents relating to a potential alternate suspect, Thomas Dillon, an Ohio resident who pleaded guilty to killing five outdoorsmen in Ohio between 1989 and 1992, including two who were murdered within two weeks of the FGA murders.  The documents revealed that Helen Nofz and her son, Derek, identified Dillon in a corporeal lineup on February 9, 1993, as the man they thought looked like a man stuck in a ditch near the scene of the FGA murders just after the shootings.  The "Serial Killer" documents were never disclosed to the prosecutor or defense before Plaintiff's July 1992 trial.

In 2023, following an investigation by the Michigan Attorney General's Office's Conviction Integrity Unit ("CIU"), the Kalamazoo County Prosecutor,

1

Jeff Getting, agreed to vacate Plaintiff's conviction based on a *Brady* violation for the nondisclosure of the Thomas Dillon evidence.  On June 1, 2023, Prosecutor Getting dismissed criminal charges against Plaintiff.

At the time of his release, Jeff Titus, then 71, a former Marine whose responsibilities included being a member of President Richard Nixon's security detail, and who had never had a criminal record, had spent over 21 years in prison.

## PLAINTIFF'S STATEMENT OF UNDISPUTED FACTS

The undisputed facts of this case are the following:

On November 17, 1990, at approximately 4:30 p.m. – 5:00 p.m., two men, James Bennett and Doug Estes, were fatally shot at close range while hunting in the Fulton State Game Area ("FGA") in Kalamazoo County.  (1st Amended Complaint, ¶ 9, ECF No. 12, PageID.80).

Two witnesses, Helen Nofz, and her son, Derek, were asked to help a man whose vehicle was stuck in a ditch at Y Avenue and 46th Street, near the murder scene, shortly after a series of gunshots was heard.  Later, Ms. Nofz told police detectives of their encounter and helped develop an artist's composite sketch of the man, who was described as a "white male about 30 years of age, about 5-10 to 5-11, stocky built .... Subject was wearing wire rimmed glasses, and made the comment that the vehicle was his wife's car...." (**Artist sketch of man in the ditch, Exhibit 2**).  They also described the vehicle, believing it to be similar to a

Dodge Shadow. *Id*.

Bonnie Huffman, who also encountered the man in the ditch, told police that the man appeared extremely nervous and did not want assistance from the police. (**Det. Wiersema report, p. 4, Exhibit 3**).

On November 17, 1990, Plaintiff and his hunting buddy, Stan Driskell, arrived at the Crandall farm in Battle Creek just before dawn, before traveling to the Shepard farm at approximately 3:00 – 3:30 p.m.[3] (**J. Titus dep., pp. 90, 95, Exhibit 4**). Plaintiff has been described as a "fanatical hunter." (**H. Nofz dep., p. 84, Exhibit 5**). Late in the afternoon, as it was getting dark, Plaintiff was able to shoot and kill a doe. (**Exhibit 4 at 103**). Because it was getting dark, Plaintiff and Driskell decided to dress the deer at home and use some of the entrails for his fox traps the next day. *Id*. at pp. 105-106. The two men stopped at a Battle Creek Burger King at 6:44 p.m., where Stan Driskell called home and spoke to his wife. *Id*. at 107.

Sometime around 7:00 p.m., Plaintiff and Stan Driskell returned home to Plaintiff's house that was adjacent to the FGA. They saw bright lights from across the road from Plaintiff's house and went to investigate. *Id*. at 110-111. There, they encountered deputies from the KCSO investigating the Bennett/Estes murders. *Id*.

---

[3]   Plaintiff hunted the Crandall and Shepard farms for decades, as he began working for Mr. Crandall when he was approximately 12 years old and considered the Crandall family to be his second family. (**Exhibit 4 at 200**).

Plaintiff dropped Driskell off at Plaintiff's house.  He then drove to a neighbor's house, Pat Burnsworth, to tell them what was happening across the road. *Id*. at 123.  He estimated the time to be between 8:00 – 9:00 p.m. *Id*.  At Ms. Burnsworth's house, he met Ms. Burnsworth and her daughter, Bonnie Huffman, who also had been hunting that day.  Plaintiff spent approximately five minutes talking with the two women before returning home. *Id*. at 125.

Detective Bruce Wiersema, the lead investigator for the Kalamazoo County Sheriff's Office ("KCSO") interviewed Ms. Burnsworth and Ms. Huffman. They indicated that Plaintiff came to their house after dark, between 8:00 – 9:00 p.m. Wiersema wrote out a statement that Ms. Huffman signed, memorializing Plaintiff's visit to the Burnsworth house. **(B. Wiersema dep., pp. 171-73, Exhibit 6)**.

Wiersema and Roy Ballett, the other main investigator, ruled out Plaintiff as a suspect because they verified his alibi that he was hunting 27 miles away at the Shepard farm that day with his hunting buddy, Stan Driskell. *Id*. at 144.  Plaintiff also passed a polygraph administered by Det. Ballett, the KCSO polygrapher. *Id*. at 175.

In 1993, Det. Wiersema learned of Thomas Dillon, a serial killer of

outdoorsmen, who had been arrested in Ohio.[4]  He was suspected of other killings in other states. *Id*. at 39-40, 120-122.

Helen Nofz and her son travelled to Ohio at Kalamazoo County Sheriff's Office Det. Bruce Wiersma's request to view a physical lineup involving a suspect in several murders in Ohio and a suspect in the Bennett/Estes murders. (**Lineup report and photos, 02-09-93, Exhibit 7**).  They both affirmatively identified Thomas Dillon as the person they thought was the man in the ditch shortly after the Bennett/Estes murders. (**Exhibit 6 at 163-64**).



**Thomas Dillon (from 1993 court appearance) and artist sketch (Exhibit 8)**

---

[4]  Dillon would ultimately plead guilty in 1993 to the murders of five outdoorsmen in Ohio.  He died in prison in 2011.  *"Killer Dillon, who hunted outdoorsmen, is dead,"* Columbus Dispatch, Oct. 22, 2011. https://www.dispatch.com/story/news/crime/2011/10/22/killer-dillon-who-hunted-outdoorsmen/23337374007/ (last visited Jan. 27, 2025). (**Exhibit 9**).

Det. Wiersema and Lt. Terry Van Streain, who accompanied Wiersema to Ohio for the lineup, were excited and viewed it as a positive development. **(Exhibit 6 at 164)**.  They advised the homicide section of the development, which included Defendant Mike Brown. *Id*. at 96, 164.

Later, Det. Wiersema ruled out Thomas Dillon because they weren't sure Dillon could have made the drive from Ravenna, Ohio, where he had been hunting that morning, to the FGA by 4:45 p.m. *Id*. at 164-66.

Following their return, Det. Wiersema and Lt. Van Streain dictated a report to the file regarding the Nofz identification of Thomas Dillon as the man in the ditch. *Id*. at 72-73.  The reports have never been disclosed.

Unfortunately, despite an exhaustive investigation, the case went cold, with no arrests being made.  The Bennett/Estes murders languished as a cold case until a newly formed KCSO Cold Case Unit took it over in approximately 2000.  The Cold Case Unit was led by Team Leader, Mike Werkema, and included Mike Brown, a representative of the Kalamazoo County Sheriff's Office. **(M. Werkema dep., pp. 28-29, Exhibit 10)**.

The Bennett/Estes murder file was brought by Defendant Brown from the KCSO to the CCT offices, which were at a secret location.[5] **(Exhibit 6 at pp. 79, 157-58)**.

---

[5]  The CCT offices were at an undisclosed location. **(Exhibit 10 at 20)**.

Having no new evidence, Werkema and Brown focused on Titus as the prime suspect in the murder.  Brown considered Titus the prime suspect immediately upon review of the file.  "Jeff Titus shot those two people through their hunting tags in their back. The message was: 'Stay off my property. Don't come hunting on my property.' *My mind was made-up.  Now it was my job to go after it and prove it*." **("Killer in Question" transcript, Pt. 2, p. 9, Exhibit 11)** (Emphasis added).  "Oh, hell yeah. *I thought right away, Titus, property owner next door. I thought he did it.*" **("Killer in Question" transcript, Pt. 1, p. 11, Exhibit 12)** (Emphasis added).

An arrest warrant was issued for Plaintiff's arrest on December 10, 2001. **(Warrant authorization, 12-10-01, Exhibit 13)**.  He was arrested on December 12, 2001.

### Trial in July 2002

At Plaintiff's July 2002 trial, the prosecutor, Scott Brower, paraded a series of witnesses to testify that Jeff Titus had threatened them for trespassing on their property.  *See Titus v. Jackson*, No, 06-10770, 2009 WL 1803209 (E.D. Mich. June 24, 2009), **Exhibit 14**, for a summary of witnesses and their testimony.  Defendant Werkema has admitted that there was no forensic evidence or eyewitness testimony to implicate Plaintiff. **(Exhibit 10 at p. 56)**.  He testified that the case was circumstantial, including the testimony of Bonnie Huffman, who placed

7

Plaintiff near the scene of the crime shortly after the murders had occurred, which helped to discredit Plaintiff's hunting alibi. *Id*. at 56-57.

At trial, Ms. Huffman testified for the first time that Titus had come to her parents' house when there was still light out, but it was too dark to hunt.[6] (**B. Huffman TT[7], pp. 549-550, Exhibit 15**).  Her testimony surprised Titus' defense attorneys, led by veteran criminal defense attorney William Fette, but they did not have her signed statement to impeach her testimony. (**W. Fette dep., pp. 25-26, Exhibit 16**).  By placing Titus near the scene of the crime shortly after the murders, Ms. Huffman's testimony helped to discredit Titus' alibi that he was hunting at the Shepard farm at the time of the murders, especially when his hunting partner, Stan Driskell, testified that he did not see Titus at various times throughout the afternoon, typically between 4:00 – 6:00 p.m. (**S. Driskell TT, p. 905, Exhibit 17**).

The prosecutor stressed his theme of the case in closing argument: Jeff Titus was obsessed about protecting his property from other hunters and left his hunting spot that was 27 miles away at 4:00 p.m. to see if trespassers were on his property. Finding two men, he shot and killed them, returning to the Shepard farm to pick up

---

[6]  She testified she heard police sirens at approximately 6:00 p.m., *id*. at 568-69, which was after Titus was at the house. *Id*. at 551.

[7]  "TT" stands for "Trial Transcript."

his friend, Stan Driskell.

> Obsession: a persistent disturbing preoccupation with an often unreasonable idea or feeling or a compelling motivation. We've all experienced obsessive feelings before in our lives about one thing or another to one degree or another.
>
> <div align="center">***</div>
>
> The same was true for Jeff Edward Titus. His obsession was his land, the adjoining land and the wildlife there. His obsessive feelings must have been at an absolute peak around November 17, 1990.

**(Prosecutor closing argument, July 17, 2002, p. 1111, 1112, Exhibit 18)**.

> <div align="center">***</div>
>
> It was his obsession that either in whole or in part compelled him to sneak away from Stan, go back to his farm in Fulton. Was his desire to check his property the only reason he left, or did he do this - do that this particular afternoon to check on his traps as well? He had checked his traps [at] 4:00 in the afternoon the following day as he told detective Werkema.
>
> Indeed, the feelings that compelled him may be so far removed from your own experience that it's difficult to - for you to understand why - why he would leave Driskell behind in the woods. But you don't have to understand the reasons to know that he did.

*Id*. at 1115-16.

Prosecutor Brower also had an answer for Jeff Titus' alibi that he was hunting: Bonnie Huffman placed him near the scene of the crime just after the two murders occurred.

Describing Titus's mindset immediately after the murder, APA Brower told the jury:

> With his law enforcement and military experience, Titus was not flustered. He knew exactly what he had to do - pick up the wallet, take

<div align="center">9</div>

a quick second to see who this SOB was, scatter the contents of the Bennett wallet, make it look like something else had happened - misdirect the investigation - pick up the shells ejected from the shotgun and get out of there now; get back to the woods and the Shepard farm. If he did this right, Driskell could still alibi him.

<div align="center">***</div>

However, as he left the area southbound on 46th St. he was faced with a problem. There was Bonnie Huffman walking to her parents' house. If he could see her, she could see him; and she knew him and his vehicle. So he turned in, spoke with her and with her mother. He fed them a line about finding 2 dead men, then left.
Break the news first. His tactic worked too, for many years. Bonnie Huffman did not know until he was arrested years later that Titus was claiming he returned to his home after dark to discover the police already there. That news upset her because she knew that claim was not true. *After all, Bonnie had left the woods before it was dark and saw Titus alone - no Stan Driskell.* Plus, she heard the sirens after he left the house. *He was there before - before it was dark. And if he was there before dark, he couldn't be 27 miles away at the Shepard farm at the same time.*

*Id.* at 1117-18 (emphasis added).

Based largely on Ms. Huffman's testimony (the parade of other witnesses had simply testified that Titus had threatened them when he encountered them on his property), the jury convicted Jeff Titus of two counts of first-degree murder and two counts of felony-firearm. (**Register of Actions,** *People v. Titus***, No. 2002-0166-FC, Exhibit 19**).  He was sentenced to spend the rest of his life in prison without the possibility of parole. (**O.T.I.S., Jeff Titus, Exhibit 1**).

**Post-conviction events**

After Plaintiff's appeals were exhausted, including a habeas petition, the

<div align="center">10</div>

Michigan Innocence Clinic ("MIC") from the University of Michigan Law School, began to investigate Plaintiff's case.  In 2020, a podcaster, Susan Simpson, and a film documentary company, Red Marble Media, began investigating Plaintiff's case and the possible tie-in to Thomas Dillon and his killings in Ohio from 1989 to 1992. **(S. Simpson dep., pp. 22-24, Exhibit 20)**.  They notified David Moran, Director of the MIC, who visited the Kalamazoo County Sheriff's Office to look at the Titus file.  There, for the first time, he discovered a manilla folder labelled "*Serial Killer*" in a banker's box with the FGA murder file provided to him by the KCSO. **("Serial Killer" manilla folder, Exhibit 21; Declaration of D. Moran, ¶ 4, Exhibit 22)**.  The CCT had a file on Ohio resident Thomas Dillon, the serial killer of outdoorsmen who had been arrested and pled guilty to the murders of five hunters and fishermen in the same time frame as the Bennett/Estes murders.  The file included the lineup documents from the February 9, 1993, lineup in Coshocton County, Ohio, where Ms. Nofz and her son, Derek, had identified Dillon as the man they thought was in the ditch on November 17, 1990.

The documents Moran discovered became an exhibit to the MIC's amended Motion for Relief from Judgment, Appendix "H." **(Exhibit 23)**.[8]

---

[8]   In response to a June 2023 subpoena in a related case, the KCSO would later produce a "Serial Killer" file that contained, some, but not all, of the documents identified by Mr. Moran. **(KCSO serial killer file, Exhibit 24)**.

In October 2020, podcaster Susan Simpson traveled to Kalamazoo to visit the KCSO and view the Titus file.  Simpson found even more documents, including photographs of the February 9, 1993, Thomas Dillon lineup.  **(Feb. 9, 1993, lineup photos, Exhibit 7)**.  Ms. Simpson testified that the photos were not in the "Serial Killer" manilla folder with the rest of the Thomas Dillon materials but were found in the bottom of the Cold Case Team "Deer Hunters" banker's box shown in **Exhibit 25**. **(Photo of CCT banker's box, Exhibit 25; S. Simpson dep., pp. 38-39, Exhibit 20)**.  Included in the materials found by Moran and Simpson in the "Serial Killer" manilla folder was a **May 2, 2002**, report from CCT detective Gwen Romanak that memorialized an interview of Helen Nofz. **(Exhibit 22 at ¶ 4; Exhibit 20 at ¶ 80-81; 132)**.  Ms. Nofz told Werkema and Romanak that she had traveled to Ohio years before with Det. Wiersema and "there was a man who looked like the person she saw in the ditch, however this was approximately 2 years after the incident."  **(Romanak report, 05-02-02, p. 3, Exhibit 26)**.  She had described the man in the lineup as being approximately 5'10", roughly the size of Werkema, who was 5'10", 200 lbs. *Id*. at p. 1.[9]

In 2023, the Michigan Attorney General's Office's Conviction Integrity Unit (CIU") investigated the case and verified that the "Serial Killer" evidence was not

---

[9]   At his arrest, Thomas Dillon was 5'10", 190 lbs. **(Coshocton Cty. Sheriff Office arrest report, Exhibit 27)**.

disclosed to the Kalamazoo County Prosecutor's Office by the police.  The Kalamazoo County Prosecutor, Jeff Getting, a former assistant prosecutor and defense attorney, agreed to vacate the convictions. **(Stipulated Order Vacating Convictions, 02-22-23, Exhibit 28)**.

Prosecutor Getting held a press conference on February 23, 2023, to announce the decision to vacate the convictions.  He stated, in pertinent part, "how that information [the Thomas Dillon evidence] that was in the possession of law enforcement didn't come to be in possession of the prosecutor's office before the trial in 2002, I don't know and can't speak to how that happened, but I'm convinced that it did.  *And because it didn't get into the hands of the prosecutor's office before the trial, it didn't get in the hands of the defense attorney*." **(Transcript – February 23, 2023, press conference, p. 9, Exhibit 29)**.

On June 1, 2023, Mr. Getting again held a press conference, this time to announce that the criminal charges against Mr. Titus were being dismissed.  There, he stated:

- "Ultimately, I don't know [how the Thomas Dillon evidence did not get to the defense].  It -- it's very speculative.  It's -- what I can -- I'm not convinced on how.  I am convinced it didn't, which is why the conviction was overturned." **(Transcript – June 1, 2023, press conference, p. 12, Exhibit 30)**.

- "I'm willing to say that the trial that led to his conviction was fundamentally flawed.  I don't know what the phrase 'wrongfully' means.  *I will say that he did not get a fair trial.*  And as a result, the conviction was overturned by agreement with -- you know, by

13

agreement of me, the attorney general, and the federal court." *Id.* at 12-13 (emphasis added).

- "None of that means that that information isn't relevant, that that information isn't exculpatory, and that that information shouldn't have been provided to Mr. Titus and his attorney when he was charged and prosecuted. *All of it is important, relevant, exculpatory, and powerful evidence.*" *Id.* at 16 (emphasis added).

On June 1, 2023, after 21 years of wrongful imprisonment, Jeff Titus, then 71, was freed. **(Order of Dismissal, Exhibit 31)**. From the date of his arrest on December 12, 2001, to June 1, 2023, when criminal charges were finally dismissed by the Kalamazoo County Prosecutor's Office, Jeff Titus had been seized and/or incarcerated for a total of **7,842 days**, or 21 years, 5 months, and 21 days.

## The "Withheld *Brady* Evidence"

The *Brady* evidence consists of the following:

1. The Thomas Dillon "Serial Killer" folder documents discovered by David Moran and Susan Simpson in 2023 including the photo lineups;

2. The evidence that Werkema and Brown knew of Thomas Dillon and the fact that Ms. Nofz and her son selected Thomas Dillon out of a lineup on February 3, 1993; and

3. The signed Bonnie Huffman statement made within days of the murders indicating that Plaintiff did not visit her parents' house until approximately 8:00 – 9:00 p.m. on November 17, 1990.

The instant motion involves Count I (*Brady* violation) as to both Defendants.

14

# LEGAL ARGUMENT

## I.   SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  See Fed.R.Civ.P. 56(c).  A genuine issue of material fact exists when there is "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249; 106 S.Ct. 2505 (1986).  In applying the summary judgment standard, the court must review all materials supplied, including all pleadings, in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587; 106 S.Ct. 1348 (1986).

To meet its burden, the moving party can either present evidence showing the lack of genuine dispute as to material facts, or it may show the absence of evidence to support the nonmoving party's claims. *Celotex Corp. v. Catrett*, 477 U.S. 317; 106 S.Ct. 2548 (1986).

The nonmoving party may not rely on bare allegations or denials but instead must support a claim of disputed facts by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations ... admissions, interrogatory answers, or other materials." Fed.R.Civ.P. 56(c)(1)(A).  That evidence must be capable of

15

presentation in a form that would be admissible at trial. *See Alexander v. CareSource*, 576 F.3d 551, 558–59 (6th Cir. 2009).  Any supporting or opposing affidavits "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated."  Fed.R.Civ.P. 56(c)(4).

Finally, "[a] mere scintilla of evidence is insufficient" to withstand a summary judgment motion; rather, "there must be evidence on which the jury could reasonably find for the non-moving party." *Smith Wholesale Co., Inc., v. R.J. Reynolds Tobacco Co.,* 477 F.3d 854, 861 (6th Cir. 2007) (internal quotation marks and citation omitted).

## II.    DEFENDANTS ARE LIABLE FOR DUE PROCESS "*BRADY*" VIOLATIONS (COUNT I).

### A.    The *Brady* Doctrine

In *Brady v. Maryland*, 373 U.S. 83; 83 S.Ct. 1194 (1963), the Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady,* 373 U.S. at 87.  The Supreme Court has expanded the *Brady* doctrine to encompass impeachment evidence as well as exculpatory evidence. *United States v. Bagley*, 473 U.S. 667; 105 S.Ct. 3375; 87 L.Ed.2d 481 (1985) (Impeachment evidence is "evidence favorable to an accused ... so that, if disclosed

16

and used effectively, it may make the difference between conviction and acquittal"). *Id.* at 676. *Bagley* also held that the government had a duty to disclose such evidence, regardless of a defense request. *Id.* at 682.

A plaintiff establishes a *Brady* violation by showing "that (1) the evidence at issue is favorable to him; (2) the State, either willfully or inadvertently, suppressed that evidence; and (3) prejudice ensued." *Harbison v. Bell,* 408 F.3d 823, 830 (6th Cir. 2005) (*citing Strickler v. Greene,* 527 U.S. 263, 282; 119 S.Ct. 1936; 144 L.Ed.2d 286 (1999)).

The *Brady* doctrine expressly applies to police officers. *See Moldowan v. City of Warren*, 578 F.3d. 351, 381 (6th Cir. 2009)  ("[B]ecause the police are just as much an arm of the state as the prosecutor, they inflict the same constitutional injury when they hide, conceal, destroy, withhold, or even fail to disclose material exculpatory evidence").  Police officers have an "unwavering" duty to turn over exculpatory evidence when its exculpatory value is "apparent" to the officer. *D'Ambrosio v. Marino*, 747 F.3d 378, 389 (6th Cir. 2014) (citing *Moldowan*, 578 F.3d at 384, 388).  Police officers fulfill their *Brady* obligations as long as they "inform the prosecutor about evidence that undermine[s] the state's preferred theory of the crime." *Moldowan,* 578 F.3d at 378.  A § 1983 plaintiff need not demonstrate the evidence was withheld in bad faith. *Id.* at 388-89 ("The reason no *further* showing of animus or bad faith is required is that where police have in their

17

possession evidence that they know or should know might be expected to play a significant role in the suspect's defense the destruction or concealment of that evidence can *never* be done in good faith and in accord with their normal practice.") (internal citations and quotations omitted) (emphasis in original).

Significantly, *Brady* evidence need not be in recorded form to trigger a police officer's obligation to provide it to the prosecutor. *See Clark v. Abdallah,* 131 F.4th 432, 459 (6th Cir. 2025) ("Even if *Brady* materials are typically materials and documents in a police or prosecutor's file, we have recognized that *Brady* material need not appear in tangible form and that allegations of police misconduct can independently support a *Brady* claim."); *Barton v. Warden, Southern Ohio Correctional Facility*, 786 F.3d 450, 465 (6th Cir. 2015) ("We must thus address the question of whether [witness] statements, known to the police but unrecorded, can properly be considered *Brady* evidence.  We answer in the affirmative."); *United States v. Rodriguez*, 496 F.3d 221, 226 (2d Cir. 2007) ("The obligation to disclose information covered by the *Brady* and *Giglio* rules exists without regard to whether that information has been recorded in tangible form").  This would seem obvious to any reasonable officer; otherwise, the police could simply "game the system" by not recording or memorializing *Brady/Giglio* evidence.

## B.    Police Must Disclose Evidence of an Identifiable Alternate Suspect.

It was well established long before Plaintiff's 2016 trial that the State was to

18

disclose evidence of identifiable alternate suspects.  In *Bies v. Sheldon*, 775 F.3d 386, 400 (6th Cir. 2014), a writ of *habeas corpus* was granted in a 1992 murder case due to the prosecutor's failure to disclose the existence of alternate suspects, two of whom confessed to committing the crime.  "While the State is not necessarily required to disclose every stray lead and anonymous tip, it must disclose the existence of 'legitimate suspect[s] . . ..' " (quoting *D'Ambrosio v. Bagley,* 527 F.3d 489, 499 (6th Cir. 2008)).  "Withholding knowledge of a second suspect conflicts with the Supreme Court's directive that 'the criminal trial, as distinct from the prosecutor's private deliberations, [be preserved] as the chosen forum for ascertaining the truth about criminal accusations.' " *United States v. Jernigan*, 492 F.3d 1050, 1056-57 (9th Cir. 2007) (quoting *Kyles v. Whitley*, 514 U.S. 419, 440; 115 S.Ct. 1555; 131 L.Ed.2d 490 (1995)). *See also Virgil v. City of Newport*, 545 F.3d 444, 475 (E.D. Ky. 2021) ("That investigators ultimately abandoned the serial killer investigation, moreover, does not diminish the exculpatory nature of the evidence concerning alternative suspects.") (citing *Bies*, 775 F.3d at 400).

In *Hughbanks v. Hudson*, 2 F.4th 527, 536-37 (6th Cir. 2021), the Sixth Circuit stated, "[I]n determining what constitutes a 'legitimate suspect,' we generally look to see what evidence substantiates that the suspects may have been involved in the crime." (citing *Gumm v. Mitchell*, 775 F.3d 345, 366 (6th Cir.

19

2014)); *see also Jamison v. Collins*, 291 F.3d 380, 391–92 (6th Cir. 2002) (noting that enough relevant factors consistent with the details of the crime matched a second suspect such that information concerning the suspect should have been disclosed). *See also Jernigan*, 492 F.3d at 1054 ("In a case that turned *entirely* on eyewitness identifications, the presence of a second robber in the same area fitting the very same physical description was bound to 'substantially reduce[ ] or destroy[ ]' the 'value' of the eyewitness testimony.") (quoting *Kyles*, 514 U.S. at 441) (emphasis in original).

###        C.    Police Must Disclose Impeachment Evidence, Especially When it Affects the Credibility of a Key Witness.

As noted, impeachment evidence falls under the "*Brady*" umbrella. *Bagley*, 437 U.S. at 676.  In *Harris v. Lafler*, 553 F.3d 1028 (6th Cir. 2009), Ward was the star witness against the defendant, and "the *only* piece of eyewitness evidence that directly linked Harris to the shooting ... there was no forensic or physical evidence connecting Harris to the crime." *Id*. at 1033 (emphasis in original).  The State withheld evidence that the police had offered to release witness Ward and Ward's girlfriend if he chose to testify against Harris. The *Harris* Court stated "[c]onsiderable authority from the Supreme Court and our court indicates that a defendant suffers prejudice from the withholding of favorable impeachment evidence when the prosecution's case hinges on the testimony of one witness." *Id*. at 1034 (collecting cases).

20

In *Barton v. Warden, Southern Ohio Correctional Facility*, 786 F.3d 450 (6ᵗʰ Cir. 2015), the defendant was convicted of orchestrating the murder of his wife during a staged robbery at their home.  Like *Harris*, the State's case rested upon the testimony of a single witness, Henson, who had originally told police that his brother, Phelps, was romantically involved with Barton's wife and went to her house to steal things from her.  Phelps panicked when he found the woman at home and shot her. *Id*. at 455.  The case went cold, however, when none of Phelps' DNA was found at the scene of the crime.

Eight years later, however, a "cold case squad" re-interviewed Henson, who then told the police that the defendant paid Phelps and an accomplice $3,000 to "scare her." *Id*. at 456.[10]  During the staged burglary, Barton's wife appeared and was fatally shot.  Based on Henson's testimony at trial, the defendant was convicted of involuntary manslaughter and aggravated burglary. *Id*.

Following the trial, Barton's defense team discovered evidence that the police had investigated Henson for another staged burglary in which he claimed the homeowner paid him to fake a robbery to scare his wife into moving into the city and that the police had threatened the homeowner with arrest if he did not

---

[10]   The apparent motive for the staged burglary was that the defendant wanted to scare his wife into moving from their horse farm into the Springboro city limits so that the defendant would have a chance at becoming that city's police chief. *Id*. at 456, n.2.

testify against Barton.  The *Barton* Court held that the State's withholding of

evidence surrounding Henson's staged burglary was material impeachment

evidence because its disclosure would have likely resulted in Barton's defense

team calling the homeowner, Kelly, to testify, where he would have undoubtedly

denied Henson's story, thus calling into question Henson's truthfulness.

> Consider what the jury would have had to believe if Kelly had
> actually testified in Barton's favor: that, in the span of two years, two
> farm owners, living in the same Ohio county, decided—separately—
> that they both wanted to move to the city; and decided—again,
> separately—that they could convince their families to do so only by
> staging a home burglary; and decided—once again, separately—that
> they would hire the same two-man team to stage this burglary. The
> jury would have had to believe that Henson (and the State) were
> telling the truth, despite vehement denials by Barton and every
> member of the Kelly family. The jury would have had to contend with
> the fact that the Kellys continue to live on their farm in Warren
> County, more than twenty years after Jim supposedly sought to
> frighten them into moving to the city. We believe that the evidence
> here would have done more than simply raise general questions about
> Henson's character. It would have addressed whether Henson was
> telling the truth in this specific instance.

*Id*. at 468-69.

The *Harris* Court concluded that the State's failure to disclose the evidence

of the similar story concocted by Henson warranted habeas relief.   "[Henson]

witness presented an unsupported, shifting, and somewhat fantastical story at trial.

The State suppressed material, exculpatory evidence from Barton, thereby making

it more difficult for Barton to discredit this theory.  There is a reasonable

probability that such actions affected the outcome of the trial." *Id*. at 470.

22

### D.    The Evidence Withheld from Plaintiff was Favorable and Material.

"Favorable evidence includes all evidence that creates a reasonable doubt, whether it is exculpatory or impeachment evidence." *McNeill*, 10 F.4th at 598; *see also Jells v. Mitchell*, 538 F.3d 478, 501 (6th Cir. 2008).  Whether evidence is favorable "is a relatively low threshold for a petitioner to meet: the evidence must simply be exculpatory or impeaching." *McNeill*, 10 F.4th at 598 (citing *Strickler*, 527 U.S. at 281).

"The prejudice prong is 'sometimes referred to as the 'materiality' requirement.' " *McNeill v. Bagley*, 10 F.4th 588 (6th Cir. 2021) (quoting *Bies v. Sheldon*, 775 F.3d 386, 397 (6th Cir. 2014)); *Banks v. Dretke*, 540 U.S. 668, 691; 124 S.Ct. 1256; 157 L.Ed.2d 1166 (2004) ("Coincident with the third *Brady* component—that prejudice ensued — prejudice within the compass of the 'cause and prejudice' requirement exists when suppressed evidence is 'material' for *Brady* purposes.") (citing *Strickler v. Greene*, 527 U.S. 263, 281-82; 119 S.Ct. 1936; 144 L.Ed.2d 286 (1999)).

A violation is established only where the withheld evidence is "material," i.e., "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.  A reasonable probability is a "probability sufficient to undermine the confidence in the outcome." *United States v. Mullins,* 22 F.3d 1365, 1371 (6th Cir.1994) (internal

quotations and citations omitted). "The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Kyles v. Whitley,* 514 U.S. 419, 434; 115 S.Ct. 1555; 131 L.Ed.2d 490 (1995).

In *Jernigan*, the Ninth Circuit Court stated, "[i]n considering whether the failure to disclose exculpatory evidence undermines confidence in the outcome, judges must undertake a careful, balanced evaluation of the nature and strength of both the evidence the defense was prevented from presenting and the evidence each side presented at trial." *Id*. at 1051 (internal quotation omitted). It is important, however, to recognize that the test is not one of sufficiency of the evidence. "At the outset, it is important to note what a materiality analysis is not. First, 'it is not a sufficiency of evidence test,' meaning that '[a] defendant need not demonstrate that after discounting the inculpatory evidence in light of the undisclosed evidence, there would not have been enough left to convict.' " *Hughbanks,* 2 F.4th at 540 (quoting *Kyles*, 514 U.S. at 434).

Here, each item of "Withheld Evidence" set forth above was favorable and material.

### 1.    The Thomas Dillon evidence

Defendant Werkema testified that Defendant Brown told him about Thomas

Dillon, but they considered it nothing but a "blip" because a Task Force investigating Dillon in Ohio had ruled him out as having committed the FGA murders. He admitted that the Cold Case team knew of Dillon and the February 9, 1993, Helen Nofz identification "early on" in the investigation.  **(Exhibit 10, pp. 89, 91, 101, 131, 164-65).**  He also admitted that the Cold Case team did not investigate Thomas Dillon's involvement in the FGA murders. *Id.* at 90.

The similarities, however, between Thomas Dillon, the serial killer murders and the FGA murders, were numerous and striking:

- Helen Nofz ID'd Dillon in lineup as the man who looked most like the man in the ditch.  **(B. Wiersema dep., p. 105, Exhibit 6; B. Wiersema affidavit, 06-08-21, ¶ 25, Exhibit 32)**.

- Derek Nofz ID'd Dillon in lineup as the man who looked most like the man in the ditch. *Id*.

- Thomas Dillon looked very similar to the sketch from Helen Nofz's description. **(Exhibit 8)**.

- Thomas Dillon was similar in size (5'11" 190 lbs.) and build to the sketch from Helen Nofz's description**. (Coshocton Cty. Arrest report, Exhibit 27; H. Nofz description for artist sketch, Exhibit 2)**.

- The man in the ditch wanted no help. **(B. Huffman TT, 07-10-02,**

**p. 555, Exhibit 15; H. Nofz TT, 07-16-02, p. 990, Exhibit 33**).

- The man in the ditch appeared very nervous and did not want Ms. Nofz to call the police for help getting out of the ditch. *Id.*

- Thomas Dillon pleaded guilty to killing five outdoorsmen from April 1989 to April 1992.  Article – *"Killer Dillon, who hunted outdoorsmen, is dead,"* Columbus Dispatch, 10-22-11.  (**Exhibit 9**).

- Dillon borrowed two different shotguns from two co-workers for a hunt on **Nov. 17, 1990** (then told each co-worker the single deer he killed was with their gun). **("Serial Killer" file, Bates # 001731 - 33, Exhibit 34**).

- Dillon killed one hunter on 11-10-90 and another hunter on 11-28-90.  The instant murders occurred on November 17, 1990.  **(Amended Stipulate Order Vacating Convictions, 02-23-23, ¶ 13(c), Exhibit 28**).

- Dillon had no business or connections in the Kalamazoo area.  He claimed he hadn't been to Michigan in years.  (**H. Trombitas (FBI) dep., p. 22, Exhibit 35**).

- The FBI tracked Dillon traveling hundreds of miles on weekend drives. *Id.* at 87.

- Dillon told a cell mate (Mike Chappell) of killing two hunters and no one

would be able to find out. (**M. Chappell affidavit, 06-17-21, ¶ 5, Exhibit 36**).

- All the Thomas Dillon killings but one (on the day before Thanksgiving) occurred on the weekend, like the FGA killings. (**Exhibit 28, ¶ 13(c)**).

Here, Michigan Attorney General's Office and Kalamazoo County Prosecutor's Office agreed that the withheld Thomas Dillon evidence was favorable, material, and had not been produced to the defendant in the criminal case. *Id*. at ¶ 15.  But perhaps most damning evidence is Mike Brown's candid admission in the "Killer in Question" documentary that the man in the ditch *"[c]ould be Tom. That could've been Tom in that car and, you know, got, I don't know what the hell he was doing up there, but it could've been him in the car and, he went in the ditch."* (**Documentary video, "Killer in Question, The Hunted," at 1:21:00 – 1:21:30, Exhibit 37, and transcript, Pt. 2, p. 38 of 41, Exhibit 11**).

Brown's admission is critical because, contrary to what most jurors may believe, a criminal trial is not a battle of proving guilt or innocence.  It is a test of whether the government can prove guilt beyond a reasonable doubt.  Plaintiff's *Brady* expert, attorney Steve Fishman, who has tried criminal cases in state and federal court for over 50 years, explained:

> The job of a criminal defense lawyer is to show that the prosecutor cannot meet her burden of proving guilt beyond a reasonable doubt.  It is not to prove the defendant is innocent nor is it to show that an alternate suspect committed the crime.  A defense lawyer merely

needs to convince the jury that the prosecution's theory and/or witnesses may be wrong as to any fact necessary for conviction.  If the defense lawyer can suggest that an alternate theory or fact is possible, without suspending reason or common sense, that may also be a reasonable doubt.  As long as the jury is able to conclude that the prosecution has failed to prove either the elements of the crime or the identity of the perpetrator beyond a reasonable doubt, the defendant is entitled to an acquittal.

**(S. Fishman expert report, ¶ 2, p. 3, Exhibit 38)**.

### 2.    The signed Bonnie Huffman statement

Clearly, the Bonnie Huffman signed statement would have been critical evidence to help impeach Ms. Huffman's credibility regarding the time Jeff Titus appeared at her parents' house.  Absent her trial testimony, there was no evidence placing Plaintiff near the scene of the crime anywhere near the time of the crime. **(M. Werkema dep., pp. 56-57, Exhibit 10)**.

Plaintiff's criminal defense attorney, William Fette, testified that if he had been provided with the signed Bonnie Huffman statement, the defense would have been able to "refresh her recollection" that the 8:00 – 9:00 p.m. timeframe was accurate, or Ms. Huffman would have risked being impeached with her signed statement from 12 years earlier, just after the crime had been committed.  **(Exhibit 16 at pp. 26-27)**.

Plaintiff's *Brady* expert, Steve Fishman, has set forth several ways in which Ms. Huffman's trial testimony (and the police investigation) would have been impeached by her signed statement:

28

- There is nothing more useful in impeaching a critical witness's testimony at trial than a prior signed statement made by the witness that contradicts her trial testimony.  If Huffman's signed statement had been available, the defense attorney would have shown it to her to refresh her recollection.  He would have then asked her if her memory was fresher in 1990 as opposed to 2002.  She would have then had the choice to either admit that her memory was fresher near the time of the crime, or to lose all credibility by denying that her signed statement was more accurate.

- The signed statement would have added support for her mother's testimony (Pat Burnsworth) when she recalled Jeff Titus coming to the house later in the evening around 8 – 9 p.m. (P. Burnsworth trial transcript, 7-10-02 p. 525).

- The signed statement would have assisted the defense in showing that her timeline only came into sharp focus (around dusk) after she was visited several times by Cold Case Team representatives. (See Romanak report, 4-30-02 re: Bonnie Huffman saying Titus visited the house around 6:15 – 6:30 p.m., which was still much later than the killing and would not have contradicted his alibi.).

- The signed statement would have called into question the integrity of the investigation and provided an example of the "tunnel vision" the old Case Team had with Jeff Titus, to the exclusion of other evidence.  (*See* Wiersema dep., pp. 139-141, where he testified that Werkema "proudly" stated that they got Bonnie Huffman to change her story).

- Impeaching Bonnie Huffman's credibility with her signed statement would have helped support Jeff Titus' alibi that he was hunting with Stan Driskell at the time of the murder.

**(S. Fishman expert report, p. 6, Exhibit 38)**.

Not surprisingly, Defendants have no expert witness to testify that the

Thomas Dillon and Bonnie Huffman evidence would not have been favorable or

material.  No criminal defense lawyer would risk her credibility to support defendants' position.

At bottom, each piece of withheld evidence was favorable when viewed singularly. When viewed cumulatively, as the Court must when analyzing materiality, there is no doubt that the evidence was material.

### E.      Defendants Withheld the Evidence from the Prosecutor in the Underlying Criminal Case, Either Intentionally or Inadvertently.

The State is liable for a *Brady* violation if the favorable and material evidence was withheld, *either intentionally or inadvertently*. *Harbison*, 408 F.3d at 830; *Moldowan*, 578 F.3d at 388-89 ("The reason no *further* showing of animus or bad faith is required is that where police have in their possession evidence that they know or should know might be expected to play a significant role in the suspect's defense the destruction or concealment of that evidence can *never* be done in good faith and in accord with their normal practice.") (internal citations and quotations omitted) (emphasis in original).

Defendants, however, are not liable if they disclosed the evidence to the prosecutor.  "[P]olice officers fulfill their *Brady* obligations as long as they 'inform the prosecutor about evidence that undermine[s] the state's preferred theory of the crime.' " *D'Ambrosio*, 747 F.3d at 389 (quoting *Moldowan,* 578 F.3d at 378).

Here, even construing the evidence in the light most favorable to Defendants, there is no question that they did not disclose the Thomas Dillon

evidence or the signed Bonnie Huffman statement to the trial prosecutor.

Trial prosecutor, Scott Brower, testified that if he had the statement signed by Bonnie Huffman, he would have disclosed it to the defense, consistent with his constitutional and ethical duties. **(S. Brower dep., pp. 26-27, Exhibit 39)**.  His declaration states that he did not see the Thomas Dillon evidence when he was prosecuting the Jeff Titus case. **(Exhibit 40 at ¶ 9)**.

Defense attorney William Fette testified that he never received the signed Bonnie Huffman statement and that he would have used it to refresh her recollection. **(Exhibit 16 at pp. 26-27)**.

Defendant Werkema does not recall seeing the signed Bonnie Huffman statement but admitted that if it existed, it "most definitely" should have been turned over to the defense.[11] **(Exhibit 10 at p. 64)**.  Remarkably, Werkema testified that he had never seen the Thomas Dillon "Serial Killer" manilla folder and its contents, despite being the Team Leader. *Id*. at pp. 80, 81.  Clearly, then, he did not disclose it to the prosecutor before trial, as he admitted in deposition. *Id*. at 167.

Contrary to Werkema's representation that the "Serial Killer" folder was not in the Cold Case Team file, David Moran, Director of the Michigan Innocence

---

[11]  Defendants' attorneys appear to claim that the signed Bonnie Huffman statement never existed, but it is axiomatic that what the lawyers claim is not evidence.

Clinic and Plaintiff's lead attorney during the habeas proceedings, testified that he discovered the "Serial Killer" documents in a banker's box provided to him by the KCSO during his visit to the department in June 2020. **(D. Moran Declaration, ¶ 4, Exhibit 22)**.  Likewise, Susan Simpson testified that she discovered the "Serial Killer" manilla folder and photos of the February 9, 1993, Thomas Dillon lineup in the "Deer Hunters" banker's box during her file inspection at the KCSO in October 2020. **(Exhibit 25; S. Simpson dep., pp. 37-39, Exhibit 20, discussing the lineup photos, Exhibit 7)**.  And "the court may not simply accept what may be a self-serving account by the police officer. It must look at the circumstantial evidence that, if believed, would tend to discredit the police officer's story ...." *Jefferson v. Lewis,* 594 F.3d 454, 462 (6th Cir.2010) (quoting *Scott v. Henrich,* 39 F.3d 912, 915 (9th Cir.1994)).  The Court should determine "whether the officer's story is internally consistent and consistent with other known facts." *Scott,* 39 F.3d at 915.

Moreover, the May 2, 2002, Romanak report discussing Helen Nofz's visit to Ohio with Detective Wiersema, was found in the "Serial Killer" manilla folder, as testified to by David Moran and Susan Simpson. **(Exhibit 22 at ¶ 4; Exhibit 20 at pp. 80-81, 132, respectively)**.

It is clear that Werkema was aware of and did not disclose the "Serial Killer" manilla folder or Thomas Dillon lineup photos to the prosecutor because he claims that the banker's box simply contained "investigative notes" that did not

32

need to be disclosed; the Cold Case team determined what was relevant evidence for the prosecutor. **(Exhibit 10 at pp. 85-89)**.  When viewing the evidence in totality, it is beyond dispute that the Thomas Dillon and Bonnie Huffman evidence was not disclosed to the prosecutor.

It is also clear that Brown was aware of the Huffman signed statement.

## F.    Defendants' Defenses Do Not Create a Genuine Issue of Material Fact.

Defendants will claim that they had no duty to disclose either the Thomas Dillon evidence or the Bonnie Huffman signed statement from 1990 because they were unaware of either piece of evidence.  *Moldowan*, however, requires that police disclose favorable evidence to the prosecutor "where they *have in their possession evidence that they know or should know* might be expected to play a significant role in the suspect's defense …." *Moldowan,* 578 F.3d at 378 (internal citations and quotations omitted) (emphasis added).

Here, Werkema has testified that he was aware of Thomas Dillon and the fact that Helen Nofz and her son had traveled to Ohio and identified Dillon as the man they thought most resembled the man stuck in the ditch because Defendant Brown reminded him of that. **(Exhibit 10 at pp. 89-90, 101)**.  Thus, Werkema and Brown were both aware of Thomas Dillon/Helen Nofz connection, regardless of the manilla folder. Any reasonable detective would have recognized the exculpatory value of the Thomas Dillon evidence, despite Werkema's self-serving

33

statements that the Dillon evidence was a mere "blip" on their radar because he had been ruled out 12 years earlier. *Id*. at 89, 91.  And Werkema clearly recognized the impeachment and exculpatory value of the Bonnie Huffman signed statement because he would have wanted his attorney to have it if he was on trial like Jeff Titus. *Id*. at 71-73.

Brown was aware of the Bonnie Huffman signed statement because he was part of the KCSO detective bureau during the initial investigation when Wiersema led the investigation and reported back to the bureau the results of the Thomas Dillon/Helen Nofz trip. **(Exhibit 6 at 164)**.  He physically brought the FGA/Deer Hunter murder file to the Cold Case Team. *Id*. at 79, 157-58.  Werkema testified that the entire Cold Case Team, which would have included Brown, reviewed the file and would have known what was in the file. "We all did." **(Exhibit 10 at p. 47, 64)**.  And Wiersema said he placed the signed Bonnie Huffman statement in both his working file and the main (master) file.  *"The only place it can go."* **(Exhibit 6 at 172-173)**.   Thus, Brown and Werkema were aware of the signed Bonnie Huffman statement.

Rich Mattison, the longest-serving member of the Cold Case team from 1998 to 2008, has testified that it was the responsibility of the Officer-in-Charge of the file, in this case Werkema, to learn of the *Brady* evidence and disclose it to the prosecutor. **(R Mattison dep., p. 120, Exhibit 41)**.  Thus, pursuant to *Moldowan*,

34

Defendants had a duty to disclose the claimed *Brady* evidence, as they had in their possession evidence that they knew or should have known "might be expected to play a significant role in the suspect's defense …." *Moldowan,* 578 F.3d at 378. They did not.

Defendants will also claim that they had no duty to disclose the Thomas Dillon evidence because Dillon's name had appeared in newspaper articles over the 12 years prior to Plaintiff's criminal trial, and a May 2, 2002, police report ( the "Romanak report") indicated that Helen Nofz told police that "she had gone to Ohio at the request of Detective Wiersema to look at a lineup and that there was a man who looked like the person she saw in the ditch however this was approximately 2 years after the incident." (**Romanak report, 05-02-02, p. 3, Exhibit 26**).  "There can be no *Brady* violation where a defendant 'knew *or should have known* the essential facts permitting him to take advantage of any exculpatory information.' " *United States v. Castano*, 906 F.3d 458, 466 (6th Cir. 2018) (emphasis added) (quoting *United States v. Clark*, 928 F.2d 733, 738 (6th Cir. 1991)). *But see United States v. Paulus*, 952 F.3d 717, 725 (6th Cir. 2020) ("*Brady* 'does not allow the State simply to turn over *some* evidence, on the assumption that defense counsel will find the cookie from a trail of crumbs.'") (alteration and citation omitted).

In deciding whether evidence was suppressed, the relevant question is

whether the defendant "would have had to follow a long trail of crumbs to get the missing details or whether he could have gotten the same information with minimal investigation." *Paulus*, 952 F.3d at 725 (explaining that "minimal investigation" is limited to "a simple search or request," such as an easy search of public records, and does not include subpoenaing information).

Here, there was a single "crumb," not a "trail of crumbs." There was but a single vague mention of Ms. Nofz's trip to Ohio in a police report among countless police reports spanning a 12-year homicide investigation. There was no mention of "Thomas Dillon," "serial killer of outdoorsmen," etc. Even Werkema discounted the Thomas Dillon information as a mere "blip" in the Cold Case team investigation that merited no investigation. **(Exhibit 10 at pp. 131-32)**.

Plaintiff's defense attorneys were not retained until late 2001. **(W. Fette dep., p. 6, Exhibit 16)**. Fette did not generally read newspapers. *Id*. at 17-18. Defendants will be able to cite no case that stands for the proposition that a lawyer has a legal duty to scour newspapers to discover potential alternate suspects of which the police are aware.

It is beyond debate that Plaintiff's defense team was not made aware of the "essential facts" necessary to develop Thomas Dillon as an alternate suspect, thereby relieving Defendants of their *Brady* disclosure obligations. Thus, their defenses are unavailing.

36

## III.    DEFENDANTS ARE NOT ENTITLED TO QUALIFIED IMMUNITY.

### A.    The Qualified Immunity Doctrine

The doctrine of qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 477 U.S. 800, 818; 102 S.Ct. 2727; 73 L.Ed.2d 396 (1982).  "Put simply, qualified immunity protects 'all but the plainly incompetent or those who knowingly violate the law.' " *Mullenix v. Luna*, 577 U.S. 7, 12; 136 S.Ct. 305; 193 L.Ed.2d 255 (2015) (quoting *Malley v. Briggs*, 475 U.S. 335, 341; 106 S.Ct. 1092; 89 L.Ed.2d 271 (1986)).

To overcome a public official's claim of qualified immunity, a plaintiff must show that the facts, taken in a light most favorable to the plaintiff, would allow a reasonable fact finder to determine (1) that there was a violation of a constitutional right, and (2) that the right was "clearly established" at the time of the violation. *Pearson v. Callahan*, 555 U.S. 223, 232; 129 S.Ct. 808; 172 L.Ed.2d 565 (2009). *Pearson* allowed the district court to determine the order of the qualified immunity analysis. *Id.* at 236.

The Sixth Circuit has established that summary judgment is inappropriate where there are contentious factual disputes over the reasonableness of an individual defendant's conduct.  When "the legal question … is completely

dependent upon which view of the facts is accepted by the jury," the district court cannot grant a defendant's motion for summary judgment on qualified immunity grounds. *Sova v. City of Mt. Pleasant,* 142 F.3d 898, 903 (6th Cir. 1998).

When determining whether a defendant officer is entitled to qualified immunity, "the court may not simply accept what may be a self-serving account by the police officer. It must look at the circumstantial evidence that, if believed, would tend to discredit the police officer's story ...." *Jefferson,* 594 F.3d at 462 (6th Cir.2010) (quoting *Scott v. Henrich,* 39 F.3d 912, 915 (9th Cir.1994)).  This includes a determination of "whether the officer's story is internally consistent and consistent with other known facts." *Scott,* 39 F.3d at 915.

### B.   Plaintiff's *"Brady* Violation" Due Process Claim was Clearly Established in 2002.

Defendant's constitutional obligations under *Brady* were clearly established long before 2002, the time of Plaintiff's criminal trial and conviction. *See Jackson v. City of Cleveland*, 925 F.3d 793, 823 (6th Cir. 2019) (holding that in 1975, *Brady*-derived claims against police officers were clearly established).

### C.   It Was Clearly Established By 2002 That a Police Officer Must Disclose Evidence of an Identifiable Alternate Suspect.

More specifically, it was clearly established that the police must disclose evidence of legitimate alternate suspects. *D'Ambrosio,* 527 F.3d at 499 (habeas relief granted from a *Brady* violation in a 1988 criminal trial.  The Court held that

the prosecution must disclose evidence of "legitimate suspects"); *Jamison*, 291 F.3d at 391–92 (a *Brady* violation occurred in a 1985 criminal trial where enough relevant factors in a crime matched a second suspect such that information concerning the suspect should have been disclosed); *Moldowan*, 578 F.3d at 382 (Holding that in 1990 a reasonable police officer would have known that suppressing evidence of an alternate suspect was a violation of the accused's constitutional rights.).

### D. It Was Clearly Established By 2002 That a Police Officer Must Disclose Evidence That Will Impeach the Testimony of a Key Witness.

A police officer's duty to disclose impeachment evidence was clearly established long before Plaintiff's 2002 trial. *See United States v. Bagley*, 473 U.S. 667; 105 S.Ct. 3375; 87 L.Ed.2d 481 (1985) (Impeachment evidence is "evidence favorable to an accused ... so that, if disclosed and used effectively, it may make the difference between conviction and acquittal"). *Id.* at 676.  *Bagley* also held that the government had a duty to disclose such evidence, regardless of a defense request. *Id.* at 682. *See also Strickler v. Greene*, 527 U.S. 263, 282 n.21; 119 S.Ct. 1936; 144 L.Ed.2d 286 (1999) ("Our cases make clear that *Brady's* disclosure requirements extend to materials that, whatever their other characteristics, may be used to impeach a witness.") (citing *Bagley,* 473 U.S. at 676); *Harris v. Lafler*, 553 F.3d at 1034 (in a case arising out of a 1997 murder, the Court granted the

defendant's habeas petition based on a *Brady* violation, stating "[c]onsiderable authority from the Supreme Court and our court indicates that a defendant suffers prejudice from the withholding of favorable impeachment evidence when the prosecution's case hinges on the testimony of one witness.") (collecting cases).

## **<u>REQUEST FOR RELIEF</u>**

For all the foregoing reasons, Plaintiff requests that this Court GRANT his Motion for Partial Summary Judgment as to both Defendants.

Respectfully submitted,

s/Wolfgang Mueller
**MUELLER LAW FIRM**
Attorneys for Plaintiffs
41850 W. Eleven Mile Road, Ste. 101
Novi, MI 48331
(248) 489-9653
wolf@wolfmuellerlaw.com
(P43728)

Dated:  May 5, 2025

**CERTIFICATE OF SERVICE**

I hereby certify that on 5/5/25, I electronically filed the foregoing with the Clerk of the Court using the ECF system which will send notification of such filing to counsel of record.

I further hereby certify that I have mailed by United States Postal Service the paper to the following non-ECF participants:  N/A

s/Wolfgang Mueller
MUELLER LAW FIRM
41850 W. Eleven Mile, Suite 101
Novi MI 48375
248-489-9653
wolf@wolfmuellerlaw.com
(P43728)

41