# EXHIBIT 10

Michel A. Werkema
December 23, 2024

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF MICHIGAN

SOUTHERN DIVISION


JEFF TITUS, individually, Michel A. Werkema
December 23, 2024

                    Plaintiff,

          vs.                    Case No. 23-cv-00997

                                 Hon. Hala Y. Jarbou

MICHAEL WERKEMA, in his

individual capacity, MICHAEL

BROWN, in his individual capacity,

jointly and severally,

                    Defendants.

_____


          The Videotaped Deposition of MICHEL A. WERKEMA,

          Taken at 2851 Charlevoix Drive, SE,

          Suite 203,

          Grand Rapids, Michigan,

          Commencing at 9:08 a.m. www.uslegalsupport.com

          Monday, December 23, 2024,

          Before Peggy S. Savage, CSR-4189, RPR.

Michel A. Werkema
December 23, 2024

```
 1   A.   Yes, I did.
 2   Q.   All right.  I'm going to go back to the cold case team
 3        now.  You were in some secret building.  Nobody's ever
 4        told us where it was.
 5   A.   Yeah.  Yeah.  We worked -- some of the multi-juris- -- we
 6        were a multi-jurisdictional unit.  So we -- the only
 7        multi-jurisdiction unit in the county was the drug
 8        unit, so they put us under the drug commander's
 9        umbrella; so that's why we worked there.
10   Q.   You had a large office or a --
11   A.   No.
12   Q.   -- small one?
13   A.   It was about the size of this.
14   Q.   Well, that's interesting, because that's what
15        Ms. Romanak told us last week or this -- yeah, last
16        week.
17             MR. BREGE:  It's a week ago.
18             MR. MUELLER:  Okay.
19             MR. BREGE:  It's Monday.
20   BY MR. MUELLER:
21   Q.   I'm going to show you what she drew as Exhibit 87.
22             MR. MUELLER:  And for the record, I'm going
23        to --
24             Does everybody have that documentary?  I
25        can -- I imagine you do.  I'm going to mark that as
```

Michel A. Werkema
December 23, 2024

```
 1    A.    Yeah.  Yeah.  And -- and I might add, this is the
 2          second cold case office, because we were located in
 3          another building before this building was completed.
 4          So the -- the cold case team originated in a total
 5          different, old factory, and we had an office similar
 6          to this there, which was a little bigger, but -- and
 7          then when the cold -- when the drug unit new building
 8          was made, we were moved there.  This -- this was the
 9          set -- this was our office.
10    Q.    Okay.
11    A.    So there was two offices for cold case.
12    Q.    All right.  I want to focus on kind of the org chart.
13          You reported to somebody.
14    A.    I reported to Captain Larry Belen.
15    Q.    B-e-l-e-n?
16    A.    Yes.
17    Q.    Okay.
18    A.    And he was the captain of the KVET drug unit.
19    Q.    And he oversaw you as the cold case team?
20    A.    Yes.  I answered directly to him.
21    Q.    But as to the cold case team, you were the top guy?
22    A.    I was the lead -- I was the, yeah, team leader.
23    Q.    What was your -- what was your team -- team leader,
24          you were called?
25    A.    Yes.  Yes.
```

Michel A. Werkema
December 23, 2024

```
 1   Q.   All right.
 2   A.   The different departments, like, for example, the
 3        sheriff department, detective rank is sergeant.  So
 4        Madison and Mike Brown are both sergeants as well as I
 5        was.  But -- but when you get promoted to detective in
 6        the sheriff's department, you're -- you're promoted to
 7        the rank of sergeant as well.  City of Kalamazoo
 8        detective is its own rank in itself, and it's beneath
 9        a sergeant.
10   Q.   But as to this team, everybody knew Mr. Werkema is the
11        team leader?
12   A.   Yes.
13   Q.   All right.  Tell me how files were chosen.  This --
14        we've been calling it the Fulton Game Area case or the
15        Deer Hunter case.  This was not the first cold case,
16        correct?
17   A.   That's correct.
18   Q.   Tell me how a case got selected.
19   A.   Well, at first, we -- we -- we tried -- when we went
20        through cases, we -- we tried to get the ones that
21        were most solvable for be- -- like being a new year.
22        Like, for example, the first case we did was the
23        Portage case where we -- the ex-cop killed his wife
24        and said she left him and so forth, and that was a
25        large media thing.  And he actually did a confession
```

Michel A. Werkema
December 23, 2024

```
 1        between the cold case team and the prosecutor?
 2   A.   During the trial, yes.
 3   Q.   Who was the person who would have been responsible for
 4        getting the Jeff Titus file together for the
 5        prosecutor?
 6   A.   All of us.
 7   Q.   Including you?
 8   A.   Correct.
 9   Q.   You certainly reviewed the file as the team leader?
10   A.   Yes.  We all did.
11   Q.   Including you?
12   A.   Correct.
13   Q.   And you would have to know what's in the file?
14   A.   Correct.
15   Q.   So you could live up to your responsibility to the
16        prosecutor, right?
17   A.   That's correct.
18   Q.   All right.  Where were the files physically kept; in
19        that room that we showed that you had, or were there
20        file cabinets on the outside of the room?
21   A.   There was -- next to the door and the desk, there was
22        a file cabinet, but the case that we were working on
23        at that moment would be in the cold case office like
24        that.  At the new office, we had a locker area where
25        all the other unsolved homicides were kept under key
```

Michel A. Werkema
December 23, 2024

```
 1        think I was.  That she -- she saw -- she was coming

 2        out of the woods at dusk, and Jeff Titus drove by her.

 3   Q.   Okay.

 4   A.   But in the court, I remember, based on reading -- in

 5        fact, her inves- -- her -- her -- her testimony

 6        at court was even different than that, than when she

 7        talked with us.  It was like the times even changed a

 8        little.

 9   Q.   The time changed to about 5:15.

10   A.   I don't recall what the time was.

11   Q.   Do you recall, as you sit here, that her testimony in

12        trial puts Jeff Titus in the area of the murder around

13        the time of the murder?

14   A.   Yes.

15   Q.   Obviously, that would hurt his alibi.

16   A.   Yes.

17   Q.   Do you recall that there was no forensic evidence

18        tying Jeff Titus to the crime, like his blood or DNA

19        mixed in with anything with the victims?

20   A.   There was none.

21   Q.   Okay.  There were no eyewitnesses to the crime that

22        say, "Jeff Titus, I saw him shoot those guys"?

23   A.   There were none.

24   Q.   All right.  So it was a lot of circumstantial

25        evidence, and, certainly, Bonnie Huffman helped.
```

Michel A. Werkema
December 23, 2024

```
 1   A.   Correct.

 2   Q.   Because she put him in the time of the murder, right

 3        near the murder.

 4   A.   Correct.

 5   Q.   Which would destroy this alibi.

 6   A.   Correct.

 7   Q.   Now, if you were sitting on trial for a double murder

 8        like Jeff Titus and fighting for your life, you would

 9        want any evidence that would impeach Bonnie Huffman's

10        testimony, correct?

11                 MR. VANDER LAAN:  Objection, form,

12        foundation, unfair to put him in the role of the

13        defendant.

14   BY MR. MUELLER:

15   Q.   Go ahead.

16                 MR. VANDER LAAN:  Uh --

17   BY MR. MUELLER:

18   Q.   Go ahead.

19                 MR. VANDER LAAN:  You may answer.

20   BY MR. MUELLER:

21   Q.   If you were sitting at the trial and you were the

22        defendant on trial for your life, you would want your

23        lawyer to have that evidence, wouldn't you, any

24        evidence that would impeach Bonnie Huffman?

25   A.   If there was evidence, yes.
```

Michel A. Werkema
December 23, 2024

```
 1   Q.   Is that correct?
 2                  MR. VANDER LAAN:  That what?  What's --
 3                  MR. MUELLER:  Can you read my --
 4                  MR. VANDER LAAN:  What's --
 5                  MR. MUELLER:  You know, form and foundation
 6        is cool.  But the rest of it, you know that's
 7        improper.
 8                  MR. VANDER LAAN:  He didn't say he
 9        remembered there was a signed statement.
10   BY MR. MUELLER:
11   Q.   I'll ask you real qui- -- point blank.  Do you recall
12        there being a signed statement by Bonnie Huffman?
13   A.   I read that, but I don't recall it.
14   Q.   You read that in Wiersema's deposition, right?
15   A.   Yes.
16   Q.   All right.  Do you recall ever seeing a signed
17        statement?
18   A.   I don't recall.
19   Q.   If there was a signed statement, it's certainly
20        been -- should have been turned over to the
21        prosecutor, correct?
22   A.   Most definitely.
23   Q.   You can't say, as you sit here, that a signed
24        statement by Bonnie Huffman was ever turned over to
25        the prosecutor, can you?
```

Michel A. Werkema
December 23, 2024

```
 1              MR. VANDER LAAN:  Don't guess.

 2              THE WITNESS:  I don't know.

 3              MR. VANDER LAAN:  Don't guess.

 4              THE WITNESS:  I don't know that answer to

 5      that.

 6  BY MR. MUELLER:

 7  Q.   The cold case Bankers Box that we see there, that

 8       Bankers Box would have been in this room that you're

 9       talking about that we -- you drew up for me, fair?

10  A.   Fair.

11  Q.   Okay.  That Bankers Box contains a lot of stuff in

12       connection with the cold case file, correct?

13  A.   Correct.

14  Q.   In fact, if you read it, you can see FBI, because you

15       guys went down to Quantico, right?

16  A.   Yes.

17  Q.   So you know that that box is connected with Jeff

18       Titus's trial?

19  A.   Correct.

20  Q.   The material in that box should have gone to the

21       prosecutor, correct?

22              MR. VANDER LAAN:  Objection, form,

23      foundation.

24              If you -- if you know the answer, you can

25      tell him.
```

Michel A. Werkema
December 23, 2024

```
 1    BY MR. MUELLER:

 2    Q.   The material -- that's all evidence in there --

 3                 MR. VANDER LAAN:  Objection --

 4    BY MR. MUELLER:

 5    Q.   -- true?

 6                 MR. VANDER LAAN:  -- calls for speculation

 7         as to what's in there.

 8                 MR. BREGE:  Join.

 9    BY MR. MUELLER:

10    Q.   F- -- hold on.  FBI documents, police reports,

11         supplemental reports, they would be contained in that,

12         wouldn't they?

13    A.   No.

14    Q.   What would be con- -- FBI -- you've got a manila

15         folder that says FBI.  Did you not know that?

16    A.   There's a FBI -- it would be that we went to Qua- --

17         notes from the FBI when we were there.  They were

18         investigative notes.

19    Q.   Okay.

20    A.   All this would be -- this box was investigator notes,

21         silent observer tips, that kind of stuff.

22    Q.   That wouldn't go to the prosecutor?

23    A.   No.  I mean, every case we get -- you -- you -- you

24         would be overloaded.  I mean, every case gets silent

25         observers, ghost leads, and on and on.  Everything
```

Michel A. Werkema
December 23, 2024

1           does not go to -- to the prosecutor.

2     Q.    Because everything is not necessarily relevant, fair?

3     A.    That's correct.  And -- but on the same note, the

4           prosecutor is aware and knows of this box.  And as

5           does most defense attorneys, those are case files;

6           some are with notes in it.

7     Q.    The defense lawyer is talking to the prosecutor,

8           right?

9     A.    Yes.

10    Q.    You would not let a defense lawyer come into your cold

11          case team and --

12    A.    That was sacred.  No.

13    Q.    -- rummage around your files, right?

14    A.    No.

15    Q.    I mean, that's sacred --

16    A.    Correct.

17    Q.    -- right?

18          So the material in there, if it's relevant

19          to the case, has to be copied and provided to the

20          prosecutor, correct?

21    A.    Yes.

22    Q.    But you're the ones who are determining whether it's

23          just, like you said, silent observer tips, irrelevant

24          stuff from relevant stuff, right?

25    A.    Basically, that's what that is, yes.

Michel A. Werkema
December 23, 2024

```
 1   Q.   Okay.  You make the decision on that?

 2   A.   We all made the decision.  It wasn't -- it wasn't --

 3        it wasn't where I was a commander and sat in this room

 4        and said, "This goes here.  This goes here."  We're

 5        all investigating this.  This is a box with case notes

 6        in it, and everyone had free will to go in and out of

 7        it at any time --

 8   Q.   But ulti- --

 9   A.   -- as we're investigating.

10   Q.   Ultimately, you're the person sitting at the

11        prosecutor's table during trial, correct?

12   A.   I'm sitting at the table with the prosecutor, correct.

13   Q.   And you are the team leader, correct?

14   A.   Correct.

15   Q.   And you have to know what's in that file or not in

16        that file, fair?

17   A.   I don't know how to answer that.  No.  It -- it -- it

18        would be -- I mean, I'm aware of what's in that box,

19        because it was -- there was, at some point, some

20        discussion or something.  But to -- to have a factual

21        knowledge of everything that's in that box, I think

22        that would be impossible.

23   Q.   Okay.  But you're aware of the evidence that's in that

24        box; you just couldn't recite it page by page, fair?

25   A.   And we wouldn't refer to it as evidence.
```

Michel A. Werkema
December 23, 2024

```
 1   Q.   And you didn't forward it as evidence.

 2   A.   They're -- they're notes.

 3             MR. VANDER LAAN:  No.  He said refer.
                        Michel A. Werkema
                        December 23, 2024
 4             MR. MUELLER:  Oh.

 5             THE WITNESS:  We wouldn't refer to it as

 6        evidence.

 7             MR. MUELLER:  Okay.

 8             THE WITNESS:  It's notes.

 9   BY MR. MUELLER:

10   Q.   You've made that decision that it's not evidence; it's

11        notes?

12   A.   That's what that is.  It's -- it's investigative

13        notes.

14   Q.   Okay.  Can you explain to me how -- and let me get --

15        I don't want to get away from this.  What did you tell

16        Ken Kolker about your awareness of a siler -- serial

17        killer, a guy named Thomas Dillon?  We'll talk

18        specifically about Dillon.  But you knew that's the

19        guy's name, right?

20   A.   I told him specifically.  In fact, even after I

21        said -- when I was at -- when I was at the podcast, I

22        told them I didn't remember the serial killer.  When I

23        returned, I spoke -- and then I recalled the serial --

24        after speaking with -- with Mike Brown that the serial

25        killer came back to -- because it was just a blip in
```

Michel A. Werkema
December 23, 2024

```
 1          the investigation.  I was trying to tell him I was
 2          aware of the serial killer at the time we
 3          investigated.  I wasn't aware of, and I still -- only
 4          because I'm seeing it and told her, I was not aware of
 5          the Serial Killer file or its content.
 6    Q.    Okay.  But you -- Mike Brown jogged your memory that,
 7          yeah, we looked at the serial killer, Thomas Dillon,
 8          fair?
 9    A.    Yes.
10    Q.    And my understanding is somebody had ruled him out.
11    A.    We had --
12                    MR. VANDER LAAN:  There's no question.
13                    THE WITNESS:  I'm sorry.
14    BY MR. MUELLER:
15    Q.    Somebody had ruled him out.  Is that consistent with
16          what you remember?
17    A.    I was told that, yes.
18    Q.    Okay.  Did you rule him out, your -- your group?
19    A.    No.  We didn't look at him.  We did no investigation
20          into Thomas Dillon as the cold case team.
21    Q.    Because, previously, he had been ruled out, fair?
22    A.    We were told there -- there was a -- there was a --
23          there was a room discussion with cold case team, and
24          Ron Petrowski, when -- when the -- when the -- when
25          the name came up, we were told very clearly that he
```

Michel A. Werkema
December 23, 2024

| 1 | | was ruled out because he was -- he was confirmed to be |
|---|---|---|
| 2 | | at a different location in south -- I believe |
| 3 | | southeast Ohio, some 275 miles, whatever, away at the |
| 4 | | time of the homicide.  He's not our guy.  That was it. |
| 5 | | It was a blip, and it was never -- never thought of or |
| 6 | | talked about him again. |
| 7 | Q. | Okay.  Do you recall when this discussion would have |
| 8 | | been in -- in the context of a two-year time line? |
| 9 | A. | What discussion? |
| 10 | Q. | With -- about the serial killer, Thomas Dillon, and |
| 11 | | Petrowski saying, "We ruled him out," or somebody did? |
| 12 | A. | That would have been early on when we first started |
| 13 | | doing a deer hunter investigation.  I wouldn't make |
| 14 | | that assumption, but I -- I don't -- I don't -- I |
| 15 | | can't tell you exactly when that happened. |
| 16 | Q. | I don't want to -- I -- who would be able to tell you, |
| 17 | | right? |
| 18 | A. | Thank you. |
| 19 | Q. | But early on in your -- in this two-year time line |
| 20 | | of -- |
| 21 | A. | Very early on, yes. |
| 22 | Q. | Okay.  Got it. |
| 23 | | Can you explain to me, sir, how -- and I'll |
| 24 | | set this up just -- |
| 25 | A. | Louder, please. |

Michel A. Werkema
December 23, 2024

```
 1   A.   Yes.

 2   Q.   Does that jog your memory that you were there talking

 3        to her?

 4   A.   The report tells me what it says.  It does not jog my

 5        memory, no, but I would say this report is accurate.

 6   Q.   Okay.  Before you met with Helen Nofz, and this report

 7        says you did --

 8   A.   Yes.

 9   Q.   -- in May of 2002 --

10   A.   Yes.

11   Q.   -- did you know anything about she and her son going

12        down to Ohio and them selecting Thomas Dillon?

13   A.   Yes, I did.

14   Q.   All right.

15   A.   It was -- it was -- it was the serial killer from

16        Ohio.

17   Q.   Okay.  And, again, we don't have to go over it, but

18        you guys didn't focus on him anymore, because he had

19        been ruled out by the original detectives, fair?

20   A.   I was under the impression of not only the detective,

21        but the task force ruled him out as well.  That's how

22        I was made to understand that, but --

23   Q.   When were you made to understand that?

24   A.   When -- when it -- when it came up.  It was a blip.

25        When -- when Dillon came up at the -- very early on,
```

Michel A. Werkema
December 23, 2024

```
 1                    MR. MUELLER:  Okay?

 2                    MR. VANDER LAAN:  I know.

 3               He said he couldn't answer it.

 4                    THE WITNESS:  I can't answer your question,

 5          because you're asking me questions about a person who

 6          we didn't investigate, because we weren't aware of the

 7          information.

 8     BY MR. MUELLER:

 9     Q.   You were aware of Thomas Dillon.  You've already told

10          me, correct?

11     A.   And he was -- all we were aware of is that he was a

12          person that was eliminated because he was in a

13          different location some 275 miles away from our crime.

14     Q.   You did know that Thomas Dillon was a serial killer of

15          hunters, correct?

16     A.   I knew he was a serial -- there was -- I think there

17          was a fisherman, a hunter, and some --

18     Q.   Outdoorsman.

19     A.   Yeah, he was a -- he was a serial killer.  I knew

20          that.  I didn't know a lot about him.

21                    Again, he was a blip.  It was a quick -- a

22          quick conversation, and he was gone.

23     Q.   He was a serial killer of outdoorsmen, which is --

24     A.   He's a convicted --

25     Q.   -- which --
```

Michel A. Werkema
December 23, 2024

```
 1    A.    -- serial killer, that's correct.

 2    Q.    -- which is what these two victims were, outdoorsmen:

 3          Bennett and Estes, right?
                              Michel A. Werkema
 4    A.    That is correct.  But had we had an investigation, I

 5          very positively and matter-of-factly would have

 6          eliminated this man as anything close to being in our

 7          area for being a killer.  And then you're asking me to

 8          give you off-and-on ques- -- if we had that

 9          information, there would have been complete, compiled

10          reports covering everything, and it wouldn't have the

11          questions that you're asking now.

12                      But you're asking me to answer questions

13          when I didn't investigate something --

14    Q.    Okay.

15    A.    -- and not having the opportunity to investigate.

16    Q.    You heard -- you heard your lawyer say you're not a

17          lawyer.  You're speculating.  You'd leave it up to the

18          lawyers to decide whether it's relevant or not, like

19          the prosecutors?

20    A.    On the same token, if -- if we're not aware of it, you

21          can't decide if it's relevant or not if -- if you're

22          not aware that it exists.  We weren't aware that this
                      U.S. Legal Support | www.uslegalsupport.com
23          information existed.

24    Q.    Certainly, if there's a file from the cold case team,

25          a Serial Killer manila folder, you should have been
```

Michel A. Werkema
December 23, 2024

```
 1    A.    Her name?

 2    Q.    Yes.

 3    A.    I would not -- I don't know any of the secretaries'

 4          names at the sheriff's department.  In fact, I don't

 5          even remember most of the names in my own office.

 6          It's so long ago.

 7    Q.    So you don't recall who was managing the --

 8    A.    I --

 9    Q.    -- silent observer program?

10    A.    I don't.

11    Q.    And you had no knowledge of the FBI's involvement with

12          Thomas Dillon or any connection to the lineup that

13          Helen Nofz attended in 1993; would that be fair?

14    A.    I do not, no.

15    Q.    That would be fair?

16    A.    Yes.

17               Can I go back to that question, please?  I

18          remember when we first talked about Dillon, the serial

19          killer, that there was discussion also about the

20          lineup, and that was with Petrowski, and that there

21          was a tentative ID, but then was eliminated because he

22          was at a different aim -- game area.  All -- that --

23          that was all in the same discussion.  So there was

24          talk about a lineup also in that beginning.

25    Q.    So there was -- and that's Petrowski and Brown and
```

Michel A. Werkema
December 23, 2024

```
 1        you?
 2   A.   And all of us.  Rich Madison.  At the time, it would
 3        have been Petrowski --
```
Michel A. Werkema
December 23, 2024
```
 4   Q.   Gwen wasn't there?
 5   A.   -- Kevin Spencer, who is now deceased.  It'd have been
 6        Rich Madison; Calvin [sic] Spencer, who's a city
 7        detective -- Rich Madison, Mike Brown, my --
 8        Petrows- -- Petrowski, Rich Madison, Mike Brown,
 9        myself, and Calvin Spencer.
10             MR. BREGE:  Kevin or Calvin?
11             THE WITNESS:  Calvin.  Calvin Spencer.
12             MR. BREGE:  C-a-l- --
13             THE WITNESS:  K-e-v-i-n, Kevin.  Kevin.
14             MR. BREGE:  Oh, Kevin.
15             THE WITNESS:  Yeah.
16             MR. BREGE:  Sorry.
17             THE WITNESS:  And I -- I always -- he went
18        by a nickname, but he's now deceased.  Lance
19        Handlogten replaced him.
20   BY MR. MUELLER:
21   Q.   So you were aware, obviously, then that there was a
22        lineup?
```
```
23   A.   There was a lineup and --
24   Q.   And it was described as a tentative ID?
25   A.   Yeah.  In fact, I -- I -- I'm recalling it as the --
```