UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JEFF TITUS,

        Plaintiff,

                                Case No. 1:23-cv-997

v.

                                Hon. Hala Y. Jarbou

MICHAEL WERKEMA, et al.,

        Defendants.

_____/

## **OPINION**

Jeff Titus spent over twenty years in prison for two murder convictions until the Michigan Attorney General vacated those convictions due to a possible *Brady* violation.  Titus has sued Michael Werkema and Michael Brown, two of the detectives on the cold-case team that allegedly withheld from the prosecution (1) evidence pointing to an Ohio serial killer as the real culprit and (2) a written statement that could have been used to impeach a state's witness.  The parties have moved for summary judgment.

For the reasons herein, Defendants are entitled to summary judgment for Titus's claim that Werkema and Brown withheld evidence and knowledge regarding the Ohio serial killer.  In addition, Defendant Robert Cinabro, who represents Brown's estate, is entitled to summary judgment for Titus's claim that Brown withheld the written statement that could have impeached a state's witness.  But neither Titus nor Werkema is entitled to summary judgment for Titus's claim that Werkema withheld the witness statement.  Accordingly, the Court will dismiss Cinabro and allow the latter claim against Werkema to proceed.

# I. BACKGROUND

## A. Initial Investigation into the Murders

On the afternoon of November 17, 1990, Doug Estes and James Bennett were shot ten feet apart from each other while hunting in the Fulton State Game Area near Fulton, Michigan.  (*See* 11/26/1990 Wiersema Rep., ECF No. 91-4.)   Detective Sergeant Bruce Wiersema of the Kalamazoo County Sheriff's Office ("KCSO") led the investigation.  Witness interviews revealed that Estes and Bennett were hunting independently when at some point between 4:30 p.m. and 5:00 p.m. a series of gunshots rang out from the game area.  (12/3/1990 Wiersema Rep., ECF No. 91-4, PageID.756.)  Bennett's girlfriend said that Bennett had left home to go hunting at 4:38 p.m.  (12/3/1990 Wiersema Rep., PageID.755.)   Estes was hunting with his stepson, Robert "Bobby" Brown, who reported that Estes went off to hunt on his own sometime after 3 p.m. and that when it began to grow dark, Bobby went looking for Estes only to find him covered in blood, lying ten feet away from someone with a bullet hole running through him.  (11/26/1990 Wiersema Rep., PageID.747.)  An autopsy report concluded that the killer or killers had used two different types of ammunition at close range.  Bennett was shot in the back with buckshot whereas Estes was shot in the back with a 12-gauge slug.  (*Id.*, PageID.748.)

Authorities who searched the crime scene found Bennett's gun, but not Estes's shotgun.  (*Id.*)  During the search, Titus, whose property abuts the game area around 200 feet from where Estes and Bennett were shot, drove up to a sheriff's deputy in his pick-up truck, accompanied by his friend Stan Driskell.  *See Titus v. Jackson* (*Titus II*), No. 06-10770, 2009 WL 1803209, at *4 (E.D. Mich. June 24, 2009).[1]  Titus said he was in the area to check some traps.  (*See* 11/18/1990

---

[1] The Court relies in part on the recitations of the facts in decisions adjudicating Titus's motions for post-conviction relief because the parties did not file the complete trial record with their summary judgment motions.

Richards Rep., ECF No. 104-3, PageID.1317.)  Two or three days after the killings, Titus told the authorities he had found Estes's missing weapon.  (11/26/1990 Wiersema Rep., PageID.748-49.)

### 1. Titus's Alibi

When asked about his whereabouts on the afternoon of November 17, Titus told Wiersema that he had been hunting on the property of Gerald Shepard and Larry Crandall near Battle Creek, Michigan, approximately 27 miles away from the Fulton State Game Area.  (*Id.*, PageID.749.) Titus said that he and Driskell hunted until dark, that he killed a deer, and that he arrived home shortly after 7 p.m. (*Id.*)  Wiersema then contacted Shepard and his wife, who confirmed that Titus had been hunting on their property that day, that Titus did not leave until after nightfall, and that Titus had taken a deer home with him.  (*Id.*)  Wiersema eliminated Titus as a suspect based on this information and the fact that Titus passed a polygraph test.  (Wiersema Dep. 115-16, ECF No. 75-2.)

Driskell later testified at Titus's trial that he was not with Titus for the entire afternoon; he did not see Titus between 4:00 pm and 6:00 pm.  (Excerpt of Driskell Trial Tr., ECF No. 130-18, PageID.2989.)  But he confirmed that they met up at around 6:00 pm and then drove to Titus's home. *Titus II*, 2009 WL 1803209, at *11.  Driskell said that it would have taken them 30 to 40 minutes to drive from where they were hunting to Titus's property. *Id.*

### 2. Accounts of Titus's Arrival

Titus's neighbor, Patricia Burnworth, told Wiersema that she learned about the murders the day they occurred when Titus stopped by her residence between 8:00 p.m. and 9:00 p.m. and told her about them.  (12/3/1990 Wiersema Rep., PageID.755-756.)

Burnworth's daughter, Bonnie Huffman, was hunting near her parents' home by the game area that afternoon.  (*Id.*, PageID.756.)  Wiersema's report does not reference Huffman's encounter with Titus, but she apparently saw him as well.  According to Wiersema, Huffman signed a written

3

statement saying that she saw Titus at her mother's home within the same timeframe given by her mother. (*See* Wiersema Dep. 173–74.) As discussed below, however, Huffman gave a different account at Titus's trial in 2002. She claimed that she saw Titus at her mother's house between 5:15 p.m. and 6:00 p.m., before it was completely dark.

### 3. A Suspicious Motorist

A couple weeks after the killings, Wiersema ran down reports by individuals who reported seeing suspicious behavior on the day of the murders by a motorist whose car had swerved into a ditch along a road next to the game area. (*See* 12/3/1990 Wiersema Rep., PageID.755.) Helen Nofz, who lived by the game area, told Wiersema that a neighbor called her home at around 5:00 p.m. and said that a car had swerved into a ditch and needed help. (*Id.*) Nofz and her eight-year-old son, Derek, walked over to where the car was stuck with its nose in the ditch. (*Id.*) She described the automobile as a small, black hatchback. (*Id.*) According to Nofz, the driver said he swerved into the ditch to avoid a deer and that he was concerned about damaging his wife's vehicle. (*Id.*) Nofz reported that the driver was "sweating profusely" and appeared very upset. (*Id.*) She described him as a white man, approximately thirty years old, "a little bit heavy," and wearing "gold, round, wire rimmed glasses." (*Id.*) About two weeks later, Nofz reported that the car had Michigan license plates. (12/26/1990 Moyer Rep., ECF No. 130-35, PageID.3165.) And after looking through pictures of cars, Nofz said that the vehicle looked similar to a Dodge Shadow. (*Id.*, PageID.3062.) Nofz also described the driver's face to a police sketch artist. She rated the resulting sketch as bearing a 90 percent resemblance to the driver. (*Id.*) That sketch became part of the KCSO's records. (*See* Sketch, ECF No. 130-24, PageID.3066.)

Huffman also witnessed some of the events involving the driver. She reported hearing the driver refuse the assistance of three different people in extracting his car from the ditch. (12/3/1990 Wiersema Rep., PageID.756.) Huffman also heard the third volunteer tell the driver that he would

4

"call the law," and the driver changed his mind and accepted the volunteer's help.  (*Id.*)  Huffman found the about-face "suspicious."  (*Id.*)

### B. Investigation into Thomas Dillon

The murder investigation stalled after a few months.  It regained steam in January 1993, when Wiersema's friend sent him newspaper clippings discussing possible links between the shooting deaths of outdoorsmen in Ohio and those in Indiana and Michigan from 1989 to 1992. (Wiersema Dep. 39; *see* News Articles, ECF No. 130-24, PageID.3065–3066.)  In one article, an FBI agent said that a "joint federal, state, and local task force" was investigating the killings of four outdoorsmen in Ohio between 1989 and 1992, with Thomas Dillon as a possible suspect. (News Articles, PageID.3065.)  The agent mentioned additional hunting deaths that "could have been overlooked as accidents," including two in "lower Michigan" in 1990, one in northeastern Indiana in 1991, and two in northeastern Ohio in 1980 and 1983.  (*Id.*)  A different article asserted that a state and federal task force was investigating the killings of eight "sportsmen" by a "sniper" "from a long distance with a high-powered rifle," including five killings in eastern Ohio, one in northeastern Indiana, and two in Kalamazoo County, Michigan.  (*Id.,* PageID.3066.)

Around the same time, Terry Van Strean, a KCSO supervisor who had recently taken over the Fulton murder investigation, learned of Dillon and decided to travel to Ohio to evaluate whether Dillon could have killed Bennett and Estes.  (Wiersema Dep. 39–40.)  Wiersema accompanied Van Strean to Ohio.

Before the trip, Wiersema received several documents from the Ohio task force investigating Dillon.  (*Id.* at 45.)  In particular, he received a list of hunters who were counted as being present on November 17, 1990, at a controlled hunt on the grounds of a military base near Ravenna, Ohio (at the time, the base was known as the Ravenna Arsenal).  (*Id.*; Deer Hunting Party Roster, ECF No. 130-25, PageID.3089.)  The list, which was accompanied by a letter from

5

the Ravenna Arsenal, showed that Dillon was present during the "night" attendance check for the hunt (Deer Hunting Party Roster, PageID.3089), which meant that he was present "after 12:00 noon" that day (Ravenna Arsenal Letter, ECF No. 130-25, PageID.3086). Wiersema also received a tag showing that Dillon had felled a deer and checked it in with the officials monitoring the hunt at 11:20 a.m. (Wiersema Dep. 54; Deer Harvest R., ECF No. 130-25, PageID.3082.) Finally, Wiersema received a receipt showing that Dillon dropped his deer carcass off at a butcher's shop in Strasburg, Ohio, for processing that same day. (Wiersema Dep. 55; Strasburg Provision Receipt, ECF No. 130-25, PageID.3083.)

On February 9, 1993, Wiersema and Van Streain drove to Coshocton County, Ohio, with Helen Nofz and her young son Derek, so that she and Derek could attempt to identify the driver in the ditch among six participants in a lineup. (*See* 2/9/1993 Casey Rep., ECF No. 130-8, PageID.2892.) Also present at the lineup were members of the Ohio task force investigating Dillon, including Harry Trombitas, an FBI agent. (*Id.*; *see* Wiersema Dep. 63.) The Ohio task force's report after the lineup notes that both Helen and Derek each wrote down a number corresponding to one of the lineup participants. (2/9/1993 Casey Rep., PageID.2893.) The report does not specify which person Helen or Derek picked, or the certainty of their identification; however, the task force agents told Wiersema the Nofzs had picked Dillon. (Wiersema Dep. 69.) Wiersema also spoke to Helen and asked whether she was "absolutely certain" that the man she identified was the driver she saw the day of the murders; she responded that he was the person who "looks the most like him" but that she could not be "positive." (*Id.*)

Notably, no document located in the KCSO's records in 2020 indicates that the Nofzs identified Dillon. According to Wiersema, he and Van Streain each dictated a report of the trip and its outcome, and a copy of their reports would have gone into their individual working files

and the master file kept by the records department.  (*Id.* at 72–73.)  But Wiersema believes his report was "misplaced amongst KCS[O] files and cannot be located."  (*Id.* at 105.)  He does not recall seeing a copy of Van Streain's dictated report.  (*Id.* at 73.)

Wiersema regarded the outcome of the lineup as reverting the investigation "back to square one," in part, because the Nofzs did not make a "positive identification" of Dillon as the driver in Michigan.  (*Id.* at 69-70.)  Instead, they merely indicated that, of the individuals in the lineup, Dillon looked the most like the driver.  (*Id.* at 73.)  Wiersema's "bobber was lit up" by their identification, and he conveyed this sentiment, as well as the lack of a positive identification, to the other officers in the sheriff's department, including Brown.  (*Id.* at 108, 164.)  But Wiersema and Van Streain ruled Dillon out as a suspect, which Wiersema also told Brown.  (*Id.* at 108-9, 112, 126.)

For Wiersema, what eliminated Dillon as a suspect was the apparent impossibility of his driving from the Ravenna Arsenal to the processing center in Strasburg and then to Fulton, Michigan, within the window dictated by the earliest possible time Dillon could have left Ravenna and the latest possible time that Dillon could have committed the murders before swerving into the ditch at about 5:00 pm.  (*Id.* at 165; Wiersema Aff. ¶ 27, ECF No. 130-33.)  The check-in tag from the hunt at the Ravenna Arsenal shows that Dillon shot a deer at 10:30 a.m. and checked it in at 11:20 a.m.  The hunter roster and letter from the Ravenna Arsenal indicate that Dillon was still present after 12:00 pm.  Similarly, according to a 1993 report from the Coshocton County Sheriff's Department, a coordinator of the hunt at the Ravenna Arsenal hypothesized that it would have taken Dillon some time to load his deer onto a truck and drive it to the parking lot after it was tagged by officials, and that the "best case scenario is Dillon probably did not leave the property until after 12 noon."  (Shryock Rep., ECF No. 130-24, PageID.3036.)  From there, Dillon would

have had to drive south to Strasburg to drop off his deer at the butcher shop indicated on the receipt, adding more time to a possible trip to the Fulton State Game Area.

Using a software program, Coshocton County investigators calculated the driving time from Strasburg to Kalamazoo as 5 hours and 37 minutes (288 miles), and the driving time from Ravenna to Kalamazoo as 5 hours and 24 minutes (285 miles).  (*See* Automap Calculations, ECF No. 130-24, PageID.3040-3041.)  The investigators provided these calculations to Wiersema and Van Streain.  (Wiersema Dep. 165.)  Assuming Dillon left the Ravenna Arsenal at noon, these calculations suggest that Dillon could have arrived at the game area no earlier than about 5:30 pm, about half an hour after Huffman saw the driver in the ditch.  Of course, the accuracy of that estimate depends on a variety factors, including Dillon's travel speed, his actual departure time, and the duration of any detours he made along the way, such as his stop in Strasburg.[2]  Neither Wiersema nor Van Streain independently assessed the accuracy of Automap calculations by making their own drive from the Ravenna Arsenal to Fulton.  (*Id.* at 164–65.)  Nor did Wiersema attempt to account for alternate routes or evaluate whether the timing would have been more plausible if Dillon had exceeded the speed limit.  (*Id.* at 166.)  Wiersema claims that he and Van Streain wanted to continue investigating Dillon by looking up Dillon's wife's vehicle and testing how long it would have taken to drive from Ravenna to Strasburg to Fulton, but their captain "rebuffed" this request.  (*Id.* at 178-79.)

Other pieces of evidence pointing away from Dillon were the differences between his vehicles and Helen Nofz's recollections about the vehicle in the ditch.   Nofz said the car in the ditch was a black hatchback.  But Dillon's vehicle records, which Wiersema received in 1993

---

[2] Neither of the calculations account for the additional time necessary for Dillon to drive approximately 50 miles south of Ravenna to Strasburg, stop and drop off his deer, and then drive northwest toward Fulton.

(Wiersema Dep. 51), showed that he drove a gray Chevy Cavalier[3] and a red Toyota pickup truck, neither of which are black hatchbacks (*see* Dillon Vehicle R., ECF No. 130-25, PageID.3076). Also, Nofz said the car in the ditch had a Michigan license plate, not an Ohio one, yet Dillon's vehicles were registered in Ohio.  (*See id.*)

After hitting this dead end, the murder investigation went cold.  (Wiersema Dep. 157.)  No progress was made on finding the killer until a new team of investigators took a fresh look in 2000.

## C. Cold-Case Investigation

### 1. Composition of the Cold Case Team

In 1998, law enforcement agencies in Kalamazoo County formed an entity called the Cold Case and Career Criminal Apprehension Team in an effort to clear unresolved homicide cases. (Mattison Dep. 23, 27, ECF No. 104-9.)[4]  The cold-case team reopened the investigation into the Fulton State Game Area murders around May 2000.  (News Release, ECF No. 91-4, PageID.853.) Werkema was the team leader.  Other members were Brown, Ron Petrowski, Rich Mattison, and Kevin Spencer.  (Werkema Dep. 164, ECF No. 108-11.)

At various points during the investigation, the staffing of the game-area murder investigation changed.  Lance Handlogten joined the cold-case team in August 2001 (Handlogten Dep. 15–16, ECF No. 108-12), and Gwen Romanak joined in September 2001 (Werkema Dep. 35).  Handlogten and Romanak took the reins of the investigation.  (*Id.* at 96–97.)  Brown left the cold case team in January 2001 and retired in January 2002, a few months before Titus's trial. (1/17/2002 Prelim. Hr'g Tr. 187, ECF No. 108-6.)

---

[3] FBI Agent Trombitas later asserted in a 2021 interview that the Chevy Cavalier was "predominantly [Dillon's] wife's car."  (Trombitas Interview Tr., ECF No. 91-4, PageID.840.)

[4] Other excerpts of Mattison's deposition are located at ECF Nos. 130-42 and 146-3.

The first Kalamazoo County prosecutor who worked with the cold-case team was Stuart Fenton. (Fenton Dep. 12–13, ECF No. 108-15.) Scott Brower later took over that role and tried the case against Titus. (Brower Aff. ¶ 3, ECF No. 131-41.)

### 2. Transfer of KCSO Files to the Cold Case Team

When Wiersema and Van Streain worked the case, clerical staff at the KCSO detective's bureau compiled the master file of the murder investigation, while KCSO detectives maintained their own separate "working files" in their offices. (Wiersema Dep. 25, 131.) According to the bureau's normal procedure, the master file would have included the detectives' formal reports dictated to the clerical staff. (Wiersema Dep. 28, 132; Mattison Dep. 33–34, ECF No. 104-9.) The master file did not necessarily contain all the information that a detective compiled while investigating a case. (*See* Mattison Dep. 35; Werkema Dep. 86–87.) For instance, Wiersema kept some handwritten notes in his working file that were not added to the master file. (Wiersema Dep. 26, 28-29.) But generally speaking, Wiersema made copies of documents in his working file for inclusion in the master file. (*Id.* at 153.)

Around the time that the cold-case team decided to take on the Fulton murders, KCSO clerical staff made copies of the master file and put them in binders for each member of the cold-case team. (Mattison Dep. 41–42.) Brown or Mattison brought those copies to the cold-case team. (*Id.* at 43–44.) At some point, a binder was created for Fenton, the prosecutor, containing the same documents the cold-case team members received. (Werkema Dep. 33.)

### 3. Bankers Box

As of 2020, the documents pertaining to Dillon that Defendants allegedly withheld from the prosecutor were located inside a Bankers Box held by the KCSO. (2/25/2025 Moran Decl. ¶¶ 4-5, ECF No. 130-23.) The words "Deer Hunters Case," "Fulton Game Homicides," and "CCCCAT 2002" were written on the side of the box. (*See* Bankers Box Photo, ECF No. 130-26.)

The latter referred to the cold-case team.  (Wiersema Dep. 170.)  Almost all the Dillon-related documents were inside a manila folder labelled "Serial Killer."  (2/25/2025 Moran Decl. ¶¶ 4-5.) The box also contained other manila folders with information related to the murder investigation. (*See* Bankers Box Photo.)  The parties dispute whether the serial-killer folder or its contents were known to Defendants before Titus's trial.

### 4. Defendants' Knowledge of Dillon Documents

Near the outset of the cold-case investigation, Wiersema and Brown met with the cold-case team to discuss their work on the case.  (Mattison Dep. 45–47; Wiersema Dep. 79.)  Brown brought a Bankers Box of documents to the meeting.  (Wiersema Dep. 79.)  Wiersema did not review what documents were contained in the Bankers Box brought by Brown, and he does not know who prepared its contents.  (*Id.* at 79-80, 98-99.)  The documents in the Bankers Box in 2020 were not organized in the same way as Wiersema's working file or the master file held by the KCSO in 1993.  (*Id.* at 80-83.)  Mattison did not participate in the compilation of the Bankers Box either. (Mattison Dep. 53.)  But he acknowledges that the words "Deer Hunters Case" found on the box discovered in 2020 were in his handwriting.  (*Id.* at 54.)

According to Werkema, not everything in the Bankers Box received from Brown was added to the cold-case team's file and given to the prosecutor; he says the box contained "investigative notes" that were not necessarily relevant.  (Werkema Dep. 86–87.)  Similarly, Mattison says that such boxes typically contained "silent observer information" and notes. (Mattison Dep. 61.)  But according to Mattison, some documents from the Bankers Box made it into the cold-case team members' binders.  (*See* Mattison Dep. 52.)  And all members of the team, as well as the prosecutor, had access to the box.  (Werkema Dep. 87–88; Mattison Dep. 59.) Detectives would reference the notes contained therein periodically, including when they first joined the cold-case team.  (Werkema Dep. 97; Handlogten Dep. 18; Mattison Dep. 149.)

Wiersema recalls seeing a manila folder labeled "serial killer" shortly after he and Van Strain returned from Ohio. (Wiersema Dep. 127–28.) He believes that this folder was in Van Strain's working file. (*Id.* at 128.) However, Wiersema does not know what the folder contained or whether it was among the records provided to the cold-case team. (*Id.* at 129-30, 133-34.) He did not draw any attention to Dillon's potential involvement in the murders, or point to any of the documents implicating Dillon, during his interview with the cold-case team. (Wiersema Dep. 108; Wiersema Aff. ¶ 28, ECF No. 130-33.)

No member of the cold-case team recalls seeing any documents mentioning Dillon in the Bankers Box. Werkema denies that the box contained the serial-killer folder when the cold-case team conducted its investigation. (Werkema Dep. 90, 94–95, 97, 113–14, 132–33, 153.) Mattison recalls seeing a folder labeled "serial killer" (Mattison Dep. 62–63), but he does not remember seeing documents related to Dillon from the Coshocton County Sheriff's Department or the newspaper articles about a serial killer (*id.* at 63–68, 70–73, 125), and he was unaware of any cold-case team member seeing anything undermining the conclusion that Dillon was not a plausible suspect. (Mattison Dep. 176–77.) That said, Mattison does recall seeing a copy of Van Strain's report about the trip to Ohio in 1993 in the binders passed out to the cold-case team. (*Id.* at 47–48, 105.) But his understanding from this report was that "Dillon had been cleared" after the lineup. (*Id.* at 192-93.)

Construing the evidence in Titus's favor, a reasonable jury could conclude that Werkema and Brown were aware of the Serial Killer file and its contents in 2002. If those documents were in the KCSO's possession in 2020, inside a Bankers Box with Mattison's handwriting and a label referring to the cold case team, a jury could reasonably infer that those documents were in the Bankers Box held by the cold-case team during its investigation.

On the other hand, construing the evidence in Defendants' favor, a jury could conclude from the testimony of Werkema and other members of the cold-case team that Defendants did *not* possess the documents pertaining to Dillon that were discovered in the Bankers Bank in 2020.

### 5. Defendants' Knowledge of Dillon and the Nofzs' Identification

Whatever the contents of the files possessed by the cold-case team, there is no genuine dispute that Brown and Werkema had some knowledge of the prior investigation into Dillon. Brown would have known about the investigation into Dillon because he was a detective with the sheriff's department at the same time as Wiersema, and he attended meetings at which the detective's bureau would have discussed the excursion to Ohio and subsequent dropping of Dillon as a suspect. (Wiersema Dep. 185–86.) And as discussed above, Wiersema says he told Brown about the Ohio trip, Nofz's tentative identification of Dillon, and the decision to eliminate Dillon as a suspect.

For his part, Werkema acknowledges that Dillon came up "very early" during the cold case investigation. (Werkema Dep. 89-91.) Some members of the team (including Werkema, Mattison, Petrowski, and Brown) learned that Dillon was a serial killer of outdoorsmen and that Nofz and her son had traveled to Ohio and picked Dillon in a lineup. (*Id.* at 101, 131, 164-65.) They also learned that the identification by Nofz was "tentative" and that Dillon had been eliminated as a suspect because he was confirmed to be located several hundred miles away in Ohio on the day of the murders. (*Id.* at 90-91, 164.) Consequently, they never investigated Dillon. (*Id.* at 90, 109.) Handlogten and Romanak, who joined the cold-case team later in its investigation, deny ever hearing about Dillon or an Ohio serial killer. (Handlogten Dep. 28, 85; Romanak Dep. 60, ECF No. 108-14.)

### D. Investigation of Titus

The cold-case team focused on Titus as their lead suspect.  The team interviewed Titus's former coworkers at the Veteran's Administration hospital in Battle Creek and learned of inculpating statements that he made.  And in mid-2001, the team traveled to the FBI complex in Quantico, Virginia (*see* Handlogten Dep. 24–26), where FBI behavioral analysts discussed the murders with the Michigan investigators and presented their conclusion that Titus was the likely murderer (Fenton Dep. 23–25, ECF No. 108-15).  The police obtained a search warrant for Titus's property in August 2001.  (Handlogten Dep. 52.) Titus was charged in December 2001.  (Charging Request, ECF No. 108-5, PageID.2169.)

### E. Investigation of Charles Lamp

Bill Fette and Ward McDonough represented Titus after his indictment.  Fette retained Howard Swabash to investigate the case.  (Fette Dep. 30, ECF No. 104-15.)  According to a tip from an inmate, Charles Dean Lamp said in late 1990 or early 1991 that he had shot two hunters near Kalamazoo (Swabash Notes, ECF No. 104-13, PageID.1546), so the defense team investigated Lamp as an alternative suspect (Fette Dep. 20–21).  Swabash showed Helen Nofz pictures of four men, including Lamp, and asked her if any of the men was the driver of the car stuck in the ditch on the day of the murders.  (Swabash Dep. 82–83, ECF No. 104-12; 5/23/2002 Handlogten Rep., ECF No. 104-14, PageID.1552.)  Nofz said she thought Lamp looked the most like the driver.  (Swabash Dep. 84.)

### F. Revelations About an Ohio Suspect

When Romanak interviewed Nofz in May 2002 about her observations at the new lineup, she stated that she had participated in a lineup many years earlier, when Wiersema asked her to go to Ohio to identify the driver who was stuck in the ditch.  (5/2/2002 Romanak Rep., ECF No. 108-3, PageID.2149.)  Nofz said she picked the person in that lineup who looked the most like the

driver, but she was not sure it was the same person.  (*Id.*)  Nofz also stated that "Wiersema was looking at a man in Ohio for being the murder suspect," but Nofz "knew" that the car she saw "was not from Ohio" because she is from Ohio and would have recognized an Ohio license plate.  (*Id.*, PageID.2147.)  Romanak's report does not identify the Ohio suspect.

### G. Defense Team's Knowledge of Dillon

There is some evidence that Titus's defense team was aware of Dillon, though not by name. Swabash's notes refer to the "serial killing of hunters in Ohio" (Swabash Notes, PageID.1548), which he wrote after a conversation with Fette (Swabash Dep. 91), but Swabash asserts that he "didn't know about . . . anything going on" relating to the Ohio killings, and Fette did not ask him to connect those killings to Titus's case.  (*Id.* at 105-107.)  Swabash did not investigate Dillon for Titus's defense.  (*Id.* at 91–92.)  Similarly, Fette says that he did not know anything about Dillon at the time of Titus's trial and that he did not discuss Dillon with Swabash.  (Fette Dep. 19, 31–32.)

### H. New Details from Huffman

New details provided by Huffman helped solidify the prosecution's case against Titus.  In April or May 2002, Huffman apparently told police for the first time that Titus arrived at her parents' house between 6:15 p.m. and 6:30 p.m., when it was getting dark.  (5/1/2002 Romanak Rep., ECF No. 108-3, PageID.2138.)  This timing conflicted with her mother's account that Titus came to their house around 8:00 p.m. or 9:00 p.m., and with the written statement Wiersema says he took from Huffman when he interviewed her in 1990, which gave the same timeframe as her mother.  Huffman's new statement also undermined Titus's alibi somewhat because Driskell claimed that he was with Titus after 6:00 pm.  *Titus II*, 2009 WL 1803209, at *3.

Huffman also claimed that Titus said "he himself had found two dead bodies on his land." (5/1/2002 Romanak Rep., PageID.2138.)  Taken alongside Titus's alleged statement that he

personally found the bodies of Estes and Bennett on his own property, Huffman's new statements in 2002 provided additional evidence pointing toward his guilt.

### I. Flow of Information Between Cold Case Team, Prosecution, and Defense

According to Werkema, as the cold-case team synthesized information into reports, it distributed those reports to all the team members and to the prosecutor so that each could update their working files. (Werkema Dep. 49–50.) Brower sent Romanak's reports to Fette shortly after receiving them.  (Brower Decl. ¶ 2, ECF No. 133-3.)  In addition, the Kalamazoo County prosecutor's office had an "open file" policy, meaning it allowed the defendant to review the prosecuting attorney's file for favorable evidence. (Brower Dep. 19, ECF No. 108-16; *see* Fenton Dep. 46-48.)  Brower says that he gave Fette any evidence favorable to Titus that made it into the file. (Brower Dep. 69.)  Fette did not personally review the prosecutor's file.  (Fette Dep. 33.)

Yet it appears that no document specifically naming Dillon as a possible suspect or suggesting he committed the murders was turned over to the prosecution. (*See* Brower Aff. ¶¶ 9–10.)  Brower claims he did not see the serial-killer folder before or during the trial.  (Brower Dep. 18–20.) And he does not recall discussing Dillon with anyone from the cold-case team before trial.  (*Id.* at 79.)  Similarly, there is no evidence that the prosecutor or the defense received Huffman's written statement specifying that she saw Titus at her parents' house at 8:00 p.m. or 9:00 p.m.  Brower denies ever seeing such a statement, as does Fette.  (Fette Dep. 24.)

Why Dillon never came to the prosecutor's attention is a mystery.  The cold-case team collectively decided which information to include in its investigative file, and no single team member was responsible for conveying information to the prosecutor.  (Werkema Dep. 88; Mattison Dep. 110; Handlogten Dep. 77–78.)  Werkema did not discuss Dillon with Brower (Werkema Dep. 167), and there is no evidence that Brown did so.  Brower does not recall any conversations with anyone on the cold-case team about Dillon before the trial.  (Brower Dep. 79.)

Similarly, Fenton, the original prosecutor tasked to the cold-case team, does not recall discussing Dillon or a serial killer in Ohio.  (Fenton Dep. 20, ECF No. 108-15.)

### J. Titus's Criminal Trial

Titus's three-week trial began on June 26, 2002.  *Titus II*, 2009 WL 1803209, at *2.  Doug Estes's stepson, Bobby Brown, described the events leading up to his discovering the bodies of Estes and Bennett.  Officers explained that Estes's firearm was missing and that Titus reported finding it a few days later.

Burnworth described hearing five shots fired in two quick bursts sometime between 4:00 p.m. and 5:00 p.m., and she said that Titus came to her house around 8:00 p.m. or 9:00 p.m. in the evening.  *Id.*  However, Burnworth's daughter, Huffman, testified that Titus arrived somewhat earlier, after it was "too dark to hunt any longer" but before it was completely dark.  (Huffman Excerpt of Trial Tr., ECF No. 130-16, PageID.2968-2969.)

Huffman said she was hunting in the woods near her parents' property and stopped at about 5:15 p.m. because "it was getting dark."  (*Id.*, PageID.2965.)  She headed toward the road where it was lighter so that she could count her shells and unload her gun.  (*Id.*)  After reaching the road, she turned and walked north about half a mile, in the direction of her parents' house.  (*Id.*, PageID.2966-2967.)  On the way, she stopped for a few minutes to observe the suspicious driver in the ditch.  (*Id.*, PageID.2974.)  Upon arrival at her parents' home, she saw Titus pulling into the driveway.  (*Id.*, PageID.2968.)  According to Huffman, Titus told her and her mother that he had found two dead bodies.  (*Id.*, PageID.2969.)  Later, sometime after 6:00 p.m., Huffman heard sirens from emergency vehicles arriving at the scene.  (*Id.*, PageID.2970, 2971, 2974.)

Several witnesses testified about Titus's tendency to threaten individuals he thought were trespassing on his property.  Huffman said that when she was sitting in a tree straddling the border between her parents' land and Titus's, he told her to get off his property while waving around a

17

pistol.  (Huffman Excerpt of Trial Tr., ECF No. 152-3, PageID.3629–3631.)    Three other individuals said that Titus accused them of being on his property when they were not, in fact, on his property or when there was a good reason for their presence.  Two of them testified that Titus was armed when he confronted them.  *Titus II*, 2009 WL 1803209, at *6–7.

Other witnesses testified that Titus made suspicious or incriminating statements after the murders.  Some of his coworkers testified that he claimed he found the bodies of Estes and Bennett.  *Id.* at *8.  He told another coworker that he found Estes's missing shotgun and took it home before the police found it.  *Id.*  He told another that he would have "no qualms about shooting someone who was trespassing on his property" and that the victims were on his property and "deserved to die."  *Id.* at *9.  When the coworker accused him of murdering the victims, Titus replied "probably."  *Id.*  He made similar comments to other coworkers, saying to one that the victims deserved their fate because they had been trespassing on his land, and saying to another that the victims had been trespassing on his property and shooting "his" deer.  *Id.* at *8.  Titus told yet another coworker that he had confronted the victims before their deaths, "kick[ing] [them] off his property."  *Id.*  And another witness claimed Titus said he had arrived home around 4:30 p.m. on the day of the murders.  *Id.*

Detective Petrowski testified that the farm where Titus had been hunting was 27 miles away from Titus's property, and that it would take 35 minutes to drive between the two.  *Id.* at *10.

Werkema testified about a conversation he had with Titus in 2001.  Titus told Werkema that he had been hunting with Driskell near Battle Creek, that he shot a deer at around 5:45 p.m., that he and Driskell left the farm with deer in tow around 6:00 p.m., that they stopped to eat on the

way home, and that they arrived at Titus's house around 7:00 p.m., at which point the two saw the police lights behind Titus's property. *Id.*

Driskell testified that he and Titus had been hunting on the property of the Shepherds near Battle Creek on the day of the murders. He said that he and Titus went into their separate blinds around 4:00 p.m. and rejoined between 5:45 p.m. and 6:00 p.m. (Driskell Excerpt of Trial Tr., ECF No. 130-18, PageID.2989.) Driskell said he helped Titus load the deer he shot into his truck, then the two drove back to Titus's farm. *Titus II*, 2009 WL 1803209, at *11. Driskell confirmed that it was not uncommon for the two of them to be apart from one another and out of each other's sight from 4:00 p.m. to 6:00 p.m. while hunting. *Id.*

Swabash, the private investigator for Titus, testified about the information that led him to believe that Charles Lamp was the driver of the vehicle that skidded into the ditch the day of the murders, and the subsequent photo lineup that Swabash presented to Helen Nofz. Nofz then testified about her encounter with the driver of the crashed vehicle and her observations about his demeanor. Nofz testified that she selected Lamp as the person who looked most like the driver among the photos Swabash showed her, but she admitted that she could not positively identify him as the driver. *Id.* at *12–13.

After hearing all the evidence, the jury found Titus guilty of the murders.

### K. Post-Conviction Review

Titus appealed his convictions unsuccessfully. *People v. Titus* (*Titus I*), No. 243642, 2004 WL 316427 (Mich. Ct. App. Feb. 19, 2004). After exhausting his remedies in state court, Titus filed a habeas corpus petition in federal court. *See Titus II*, 2009 WL 1803209. The district court found no basis for disturbing the state court's judgment. The Sixth Circuit upheld that decision. *Titus v. Jackson* (*Titus III*), 452 F. App'x 647 (6th Cir. 2011).

### 1. Discovery of New Dillon Evidence

In 2018, the Sixth Circuit granted Titus permission to file a second habeas petition limited to the alleged withholding of evidence supporting a two-shooter theory.  *In re Titus*, No. 18-1142 (6th Cir. Apr. 25, 2018).  While that case was proceeding, Titus's petition caught the attention of Jacinda Davis,[5] who began working on an episode about the Fulton State Game Area murders for a TV series.  She later joined forces with Susan Simpson, an attorney and podcast host.

Davis and Simpson uncovered evidence inculpating Dillon that never made its way to the Michigan authorities, including Werkema and Brown.  One piece of evidence was an internal FBI report by Trombitas asserting that Helen and Derek Nofz "positively identified Dillon as the individual they saw at the vehicle stuck in the ditch" in November 1990.  (FBI Lineup Rep., ECF No. 91-4, PageID.818.)  Other evidence unknown to Defendants made it more plausible that Dillon could have been in Fulton on the day of the murders.  According to Trombitas, Dillon was "notorious" for driving hundreds of miles in a weekend, behavior that FBI agents observed firsthand.  (Trombitas Dep. 86–87, ECF No. 130-36.)  Finally, Dillon told a cellmate in 1993 that he had killed two hunters in the woods who were standing close together, after he "yelled hello" to them and they looked at him to respond.  (*See* Chappell Aff. ¶ 5, ECF No. 130-37.)  Simpson shared her findings about Dillon with the Innocence Clinic at the University of Michigan Law School.

### 2. Discovery of the Serial Killer File

When Innocence Clinic Director David Moran examined the KCSO's records in June 2020, he found the folder labeled "Serial Killer" containing 30-40 pages of documents related to Dillon.

---

[5] *See* K. Tuttle, *2 Murders 3 Decades Ago: A Podcaster and a TV Producer Dig In*, N.Y. Times (Oct. 24, 2020), https://www.nytimes.com/2020/10/21/arts/television/Killer-in-question-undisclosed-true-crime.html [https://perma.cc/4L7G-ENY7].

(2/25/2025 Moran Decl. ¶ 4; Moran Dep. 40–42, 53, ECF No. 133-4; *see* Contents of Serial-Killer Folder, ECF No. 130-24.)  The Innocence Clinic later discovered that the investigative file held by the Kalamazoo County Prosecutor's Office ("KCPO") did not contain any records mentioning Dillon.  (Kalamazoo Cnty. FOIA Resp., ECF No. 108-4, PageID.2166.)

On February 24, 2023, the Michigan Assistant Attorney General agreed to vacate Titus's convictions because evidence pointing to Dillon as an alternative suspect had not been provided to defense counsel. Am. Stip., *Titus v. Nagy*, No. 2:18-cv-11315 (E.D. Mich. Feb. 24, 2023), ECF No. 25.

### L. Procedural History of This Case

Titus filed this lawsuit against Werkema and Brown on September 19, 2023.  Brown died in 2024, so Robert Cinabro, the personal representative of Brown's estate, became the substitute party.  Because the parties have stipulated to dismiss other claims, the only remaining claim is that Brown and Werkema withheld evidence from the prosecutor in violation of their obligations under *Brady v. Maryland*, 373 U.S. 83 (1963).  Before the Court are the parties' cross-motions for summary judgment on the *Brady* claim.

## II. STANDARDS

### A. Summary Judgment

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A fact is material if it "might affect the outcome of the suit." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A material fact is genuinely disputed when there is "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id*. at 249 (citing *First Nat'l Bank of Ariz v. City Serve. Co.*, 391 U.S. 253, 288-89 (1961)).  Summary judgment is not an opportunity for the Court to resolve factual disputes. *Id*.  The Court "must shy

away from weighing the evidence and instead view all the facts in the light most favorable to the nonmoving party and draw all justifiable inferences in their favor." *Wyatt v. Nissan N. Am., Inc.*, 999 F.3d 400, 410 (6th Cir. 2021).

"This standard of review remains the same for reviewing cross-motions for summary judgment." *Ohio State Univ. v. Redbubble, Inc.*, 989 F.3d 435, 411 (6th Cir. 2021). "[A] case involving cross-motions for summary judgment requires 'evaluat[ing] each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration.'" *Id.* at 442 (quoting *EMW Women's Surgical Ctr., P.S.C. v. Beshear*, 920 F.3d 421, 425 (6th Cir. 2019)).

### B. Qualified Immunity

Defendants contend that they are entitled to qualified immunity, which "protects 'all but the plainly incompetent or those who knowingly violate the law.'" *City of Tahlequah v. Bond*, 595 U.S. 9, 12 (2021) (quoting *District of Columbia v. Wesby*, 583 U.S. 48, 63 (2018)). "At summary judgment, a government official is entitled to qualified immunity unless the evidence, viewed in the light most favorable to the plaintiff, would permit a reasonable juror to find that '(1) the defendant violated a constitutional right; and (2) the right was clearly established.'" *Raimey v. City of Niles*, 77 F.4th 441, 447 (6th Cir. 2023) (quoting *Quigley v. Tuong Vinh Thai*, 707 F.3d 675, 680-81 (6th Cir. 2013)). "If either prong is not met, then the government officer is entitled to qualified immunity." *Doe v. Miami Univ.*, 882 F.3d 579, 604 (6th Cir. 2018). The Court can consider the two prongs in any order. *Gambrel v. Knox County*, 25 F.4th 391, 401 (6th Cir. 2022).

For the second prong, the government official's conduct violates clearly established law when, "at the time of the challenged conduct, '[t]he contours of [a] right [are] sufficiently clear' that every 'reasonable official would [have understood] that what he is doing violates that right.'" *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640

(1987)).  This inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition."  *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001)).  In other words, the Court may not "define clearly established law at too high a level of generality."  *City of Tahlequah*, 595 U.S. at 12.  The level of generality is too high "if a court cannot 'immediately' say that the defendant's conduct violated the [law]."  *Clark v. Louisville-Jefferson Cnty. Metro Gov't*, 130 F.4th 571, 582 (6th Cir. 2025) (quoting *Beck v. Hamblen County*, 969 F.3d 592, 599 (6th Cir. 2020)).

"Although 'a case directly on point' is not necessary to overcome qualified immunity, 'existing precedent must have placed the . . . constitutional question beyond debate.'"  *Linden v. City of Southfield*, 75 F.4th 597, 602 (6th Cir. 2023) (quoting *al-Kidd*, 563 U.S. at 741).  The "rule must be 'settled law.'"  *Wesby*, 583 U.S. at 63 (quoting *Hunter v. Bryant*, 502 U.S. 224, 228 (1991)).  "It is not enough that the rule is suggested by then-existing precedent."  *Id.*

Once the qualified immunity defense is raised, the "plaintiff bears the burden of overcoming qualified immunity."  *Crawford v. Tilley*, 15 F.4th 752, 760 (6th Cir. 2021).  That burden includes "pointing to legal authority that clearly shows that the constitutional question . . . should be resolved in [the plaintiff's] favor."  *Linden*, 75 F.4th at 604.

### III. ANALYSIS

#### A. *Brady* Claim

Titus claims that Werkema and Brown deprived him of a fair trial by not turning over (1) evidence and knowledge pointing to Dillon as an alternative suspect, and (2) a written statement by Huffman supporting Titus's alibi.  In *Brady*, the Supreme Court held that prosecutors violate due process when they suppress material evidence that is favorable to the accused.  *Brady*, 373 U.S. at 87.  Generally, *Brady* claims have three elements: (1) "the evidence at issue must be *favorable* to the accused, either because it is exculpatory, or because it is impeaching," (2) "that

evidence must have been *suppressed* by the State, either willfully or inadvertently," and (3) the evidence was *material* in the sense that "prejudice must have ensued."  *Jackson v. City of Cleveland*, 925 F.3d 793, 814 (6th Cir. 2019) (emphases added) (quoting *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999)).  Police officers, in turn, have a duty to hand off materially favorable evidence to the prosecution, and the officers may be liable for a *Brady* violation if "'the exculpatory value' of the undisclosed evidence should have been '*apparent*' to the officers." *Clark*, 130 F.4th at 579  (emphasis added) (quoting *Moldowan v. City of Warren*, 578 F.3d 351, 382 (6th Cir. 2009)).

*Favorability*.   Evidence is favorable if it "creates a reasonable doubt, whether it is exculpatory or impeachment evidence." *McNeill v. Bagley*, 10 F.4th 588, 598 (6th Cir. 2021).  The favorability element imposes a "relatively low threshold." *Id.*

*Suppression*.   Evidence is suppressed from the defense if not made available to it. Suppression also "requires that the evidence be in the exclusive control of the state." *Id.* at 600. Police officers are not obligated to disclose that which was "readily available to the defense from another source." *Matthews v. Ishee*, 486 F.3d 883, 891 (6th Cir. 2007).  Evidence readily available from another source includes publicly available information, *Stockdale v. Helper*, 979 F.3d 498, 504 (6th Cir. 2020), as well as any information available through "minimal investigation" on the criminal defendant's part, *United States v. Paulus*, 952 F.3d 717, 725 (6th Cir. 2020).

*Materiality*.  Evidence is material if there is a "reasonable probability" that its disclosure would have resulted in a different outcome at trial.  *Hughbanks v. Hudson*, 2 F.4th 527, 539–40 (6th Cir. 2021).  A "reasonable probability" is "effectively the same as a more-probable-than-not standard." *Chinn v. Warden*, 24 F.4th 1096, 1103 (6th Cir. 2022); *see LaMar v. Houk*, 798 F.3d 405, 416 (6th Cir. 2015) (noting that reasonable probability is only "slight[ly]" lower than the

more-probable-than-not standard).  Materiality is assessed by reference to "both the evidence the defense was prevented from presenting and the evidence each side presented at trial." *Bies v. Sheldon*, 775 F.3d 386, 399 (6th Cir. 2014) (quoting *Boss v. Pierce*, 263 F.3d 734, 745 (7th Cir. 2001)).  The "tendency and force of the undisclosed evidence" is assessed "item by item," *Chinn*, 24 F.4th at 1103 (quoting *Kyles v. Whitley*, 514 U.S. 419, 436 n.10 (1995)), but its materiality is "consider[ed] . . . collectively," *id.*

*Apparent Favorability*.  As indicated, for a police officer to be liable for a *Brady* violation, the favorability of the suppressed evidence must have been "apparent" to the officer.  In other words, the officer must have been "aware that the evidence 'could form a basis for exonerating the defendant.'" *D'Ambrosio v. Marino*, 747 F.3d 378, 389–90 (6th Cir. 2014) (quoting *Moldowan*, 578 F.3d at 388 n.14).

### B. Dillon Evidence

Titus argues that Defendants suppressed the following documents and information related to Dillon: (1) the documents contained in the "Serial Killer" folder; (2) a 1993 report from the Ohio lineup; and (3) the fact (known to Defendants but not stated in those documents) that the Nofzs picked Dillon in the Ohio lineup.

According to Moran, the serial-killer folder contained the following documents in 2020 (Moran Decl. ¶ 4, ECF No. 130-23; *see* Moran Dep. 52–53):

- An information sheet on Dillon listing his biographical data and vehicles owned. (ECF No. 130-24, PageID.3032.)

- Reports from interviews by Captain Shryock of the Coshocton County sheriff's department with two of Dillon's co-workers, both of whom loaned Dillon their shotguns on or about November 17, 1990.  One co-worker loaned Dillon a gun with a

"slug barrel and a bird shot barrel." (*Id.*, PageID.3033.)  A week later, Dillon returned the gun with the slug shot barrel attached, saying he had shot a deer at the Ravenna Arsenal.  (*Id.*)  Dillon did not return the bird shot barrel.  (*Id.*)  Dillon claimed his wife had thrown that barrel away.  (*Id.*)  Another co-worker said he lent Dillon a Mossberg Pump shotgun to use at the Ravenna Arsenal in November 1990.  (*Id.*, PageID.3035.) Dillon returned it a few days later, claiming he had used it to kill a deer.  The co-worker later discovered Dillon had also borrowed a gun from someone else that same weekend. (*Id.*)

- A report of Shryock's interview with the Ravenna Arsenal hunt organizer, Tim Morgan, who told Shryock that Dillon likely did not leave the property until after noon. (*Id.*, PageID.3036–3037.)

- A communication from the Ravenna Arsenal confirming that Dillon was present there on the morning of November 17, 1990, "until sometime after 12:00 noon," and providing the check-in roster for the hunt that day.  (*Id.*, PageID.3042–3045.)

- The record from the Ravenna Arsenal showing that Dillon shot a deer at 10:30 a.m. and recorded it with officials at 11:20 a.m. (*Id.*, PageID.3038.)[6]

- The deer processing receipt from the butcher's shop in Strasburg, Ohio, dated November 17, 1990. (*Id.*, PageID.3039.)

- The Automap calculations.  (*Id.*, PageID.3040–3041.)

- The letter from Wiersema's friend attaching newspaper articles about Dillon and multiple killings of outdoorsmen.  (*Id.*, PageID.3064–3066.)

---

[6] The copy initially obtained by the Innocence Clinic is illegible.  The KCSO later produced a readable copy.  (*See* ECF No. 130-25, PageID.3082.)

- *Romanak's report on her interview with Helen Nofz in May 2002, wherein Nofz reported participating in a lineup in Ohio and identifying someone who looked like the driver in the ditch when Wiersema was investigating a murder suspect from Ohio.* (*Id.*, PageID.3046–3049.)

- *Romanak's report on her interviews with Huffman in April/May 2002.* (*Id.*, PageID.3050–3055.)

- *Moyer's report on his interview with Nofz in December 1990, in which she described the suspicious driver and the vehicle in the ditch and rated the composite sketch of the driver.* (*Id.*, PageID.3061–3063.)

- *The sketch drawn according to Nofz's description of the driver she saw in 1990.* (*Id.,* PageID.3066.)

- *A picture depicting a 1987 Dodge Shadow, the make and model of the vehicle that Nofz said resembled the car she saw in the ditch.* (*Id.*, PageID.3068.)

Of the foregoing documents, the ones identified in italics were also located in the files of the prosecutor's office and were therefore disclosed to the prosecutor. (*See* KCPO File, ECF No. 108-3; Romanak's reports, *id.*, PageID.2125-2126, 2136-2140; Moyer's report and sketch, *id.*, PageID.2151-2159; and the picture of the Dodge Shadow, *id.*, PageID.2160.) *Brady* requires police officers to turn over favorable evidence to the prosecutor. *Moldowan*, 578 F.3d at 381. Defendants fulfilled that obligation for these documents. Titus offers no evidence to suggest otherwise.

Also found in the KCSO's records, but not in the serial-killer folder, was the 1993 report by Coshocton County deputy sheriff Craig Casey indicating that the Nofzs picked someone from a lineup in Ohio, accompanied by photos of the lineup and a list of names of the individuals in the

lineup.  (*See* 2/9/1993 Casey Rep.)  The copy of this report in the KCSO's files was apparently illegible.  (*See* Wiersema Dep. 58.)  The parties obtained a legible copy from the Coshocton County sheriff's office in 2020.  (*See* Fax Transmittal Sheet, ECF No. 91-4, PageID.812.)

As indicated, none of the foregoing documents, including the documents in the serial-killer folder and the 1993 report by Casey, reveal that the Nofzs picked Dillon at the 1993 lineup.  That said, there is no genuine dispute that Werkema was aware that the Nofzs picked Dillon at the Ohio lineup.  (Werkema Dep. 101.)  And according to Werkema, Brown would have been aware of that fact as well.  (*Id.* at 164-65.)

### 1. Apparent Favorability

Titus argues that the Dillon evidence was favorable to him because it pointed to an alternative suspect.  While prosecutors (and by extension, police officers) "are not necessarily required to disclose every stray lead and anonymous tip, . . . they must disclose the existence of legitimate suspects."  *Hughbanks*, 2 F.4th at 536 (quoting *Gumm v. Mitchell*, 775 F.3d 345, 364 (6th Cir. 2014)) (cleaned up).  "In determining what constitutes a legitimate suspect, [courts] generally look to see what evidence substantiates that the suspects may have been involved in the crime."  *Id.* (cleaned up).  A legitimate suspect is one who has "a sufficient connection to the details of the crime."  *Id.* at 537; *see Jamison v. Collins*, 291 F.3d 380, 390–91 (6th Cir. 2002) (concluding that "enough factors" matched a second suspect to the crime that information concerning the suspect should have been disclosed).

Here, enough factors tied Dillon to the killings at the Fulton State Game Area to render him a legitimate suspect.  First and foremost, the killings were consistent with Dillon's apparent pattern of behavior, which involved killing hunters in Ohio and nearby states.  Also, Dillon's choice to borrow two separate shotguns for the weekend of November 17, 1990, renders his behavior that weekend somewhat suspicious.  Indeed, Wiersema and Van Streain's decision to

take the Nofzs to Ohio for the purpose of putting them before a lineup that included Dillon indicates that he was a legitimate suspect. *See Colemon v. City of Cincinnati*, No. 21-5968, 2023 WL 5095804, at *4 (6th Cir. Aug. 9, 2023) ("Because the . . . officers investigated whether the murders in their jurisdictions were linked with Welch's murder, the district court correctly reasoned that any suspects developed during that period would also be considered suspects in Welch's murder."). Also, the Nofzs' tentative identification of Dillon (and composite sketch resembling Dillon) lent some additional support to his viability as a suspect by potentially placing him near the scene of the killings. Even if the Nofzs could not affirmatively state that Dillon was the driver in the ditch, their identification would have been helpful for Titus's case.

The evidence pointing away from Dillon does not necessarily mean he was not a legitimate suspect. At the very least, he was a legitimate suspect at some point during the investigation. Also, a defense attorney could have argued reasons to discount some of the evidence exculpating Dillon. For instance, defense counsel could have argued that the driving distance from the Ravenna Arsenal to Strasburg to Fulton made Dillon's involvement improbable, but not necessarily impossible. Or defense counsel could have argued that Wiersema and Van Streain's failure to probe that timing further demonstrated the absence of an adequate investigation. *Cf. Gumm*, 775 F.3d at 370 (noting that "reports about multiple other suspects could have been introduced at trial to call into question the thoroughness of the investigation").

On the other hand, the most compelling evidence Werkema or Brown would have possessed that placed Dillon near the scene of the murders was the Nofzs' identification of him as someone who resembled the driver in the ditch.[7] Titus would have had a difficult time relying on

---

[7] The composite sketch also resembles some photographs of Dillon, but Helen Nofz's tentative in-person identification of Dillon served the same purpose as the sketch.

that identification because Helen Nofz also provided information excluding Dillon.  She repeatedly reported that she saw a black hatchback that did not have Ohio license plates, which does not fit the color, model, or registration of any vehicle that Dillon owned.  Titus would have been hard-pressed to bolster the Nofzs' tentative identification of Dillon while simultaneously discounting Helen Nofz's consistent identification of the license plate, color, and model of the vehicle at the scene.

Even if Dillon was a legitimate suspect, however, the Dillon evidence was not favorable to Titus (and would not have been apparently favorable from Defendants' standpoint) when considered as a whole.[8]  This case is similar to *McNeill*, in which the withheld evidence included a police report "detailing a potential suspect who was quickly dismissed as a suspect by the police." *McNeill*, 10 F.4th at 591.  That suspect was seen abandoning a vehicle near the scene of the crime and then fleeing the area.  *Id.* at 610-11.  The Sixth Circuit concluded that the report was not favorable to the defendant because the eyewitness who identified McNeill as the shooter "definitively stated" to the police that the alternative suspect was not involved in the shooting.  *Id.* at 599.  The Court reasoned that "[i]f the police have 'substantial exculpatory evidence to conclude that [an individual] was no longer a suspect, *Brady* [does] not apply.'"  *Id.* (quoting *Coe v. Bell*, 161 F.3d 320, 345 n.4 (6th Cir. 1998)).  According to that court, "[t]he quick removal of this suspect from the investigation means that this report is not, in fact, favorable."  *Id.*  In other words, the police report did "not have a clear tendency to exonerate" McNeill.  *Id.*

As in *McNeill*, assuming Defendants were aware of all the evidence pointing to Dillon in the KCSO's files, as well as the fact that the Nofzs selected Dillon at the Ohio lineup, Defendants

---

[8] Here, the Court considers the documents in the Serial Killer file, the 1993 lineup report from Deputy Casey, and Defendants' knowledge that the Nofzs selected Dillon.  The Court does not consider the additional FBI documents discovered by Davis and Simpson or the Chappell affidavit detailing Dillon's jailhouse confessions because there is no evidence that Defendants were aware of this information in 2002.

had "substantial exculpatory evidence to conclude" that Dillon was not a viable suspect. That exculpatory evidence included Helen Nofz's observations of the vehicle in the ditch (which were inconsistent with Dillon's vehicle records), as well as documents firmly placing Dillon hundreds of miles from the scene of the murders just a few hours before they occurred.

Also, as in *McNeill*, the police here investigated and eliminated Dillon as an alternative suspect. There is no genuine dispute that Wiersema and Van Streain investigated Dillon's potential involvement and then eliminated him as a suspect after returning from Ohio, based on evidence reflected in the Serial Killer folder. Wiersema then conveyed that conclusion to Brown, who apparently discussed that information with the cold-case team, as Werkema recalls discussing the elimination of Dillon as a suspect. Nothing in the record before the Court suggests Werkema or Brown had any reason to question Wiersema's conclusion. Applying the reasoning in *McNeill*, *Brady* does not apply to the information about Dillon.

To be sure, there are some differences between *McNeill* and the case at hand, but those differences are insignificant. For instance, *McNeill* is different because the police in that case "quickly dismissed" the alternative suspect, whereas the police here investigated Dillon for a period of time before concluding that he was not a viable suspect. But it does not follow that a quick dismissal renders an alternative suspect less favorable than one dismissed after a longer period of time. Indeed, if the police quickly dismiss an alternative suspect, it may be easier for the defendant to argue that the police investigation was inadequate. By contrast, such an argument would be less persuasive here, where the police looked into Dillon and discovered evidence that made his involvement seem far-fetched. Nofz was unable to positively identify him, his vehicles and their registration did not match the vehicle Nofz saw in the ditch, and he had a well-

documented alibi.  Thus, the speed of the dismissal does not meaningfully distinguish *McNeill* from the case at hand.

*McNeill* is also different because the only witness to the crime in that case "definitively stated" that the alternative suspect was not responsible, whereas there was no eyewitness to the Fulton murders, let alone one who "definitively" stated that Dillon was not responsible. Nevertheless, the strength of the exculpatory evidence in *McNeill* is comparable to the strength of the evidence exculpating Dillon.  In *McNeill*, "the entirety of the State's evidence exculpating" the alternative suspect was the eyewitness's statement that the alternative suspect was not the murderer.  *McNeill*, 10 F.4th at 611 (Clay, J., dissenting).  However, the same evening that the eyewitness ruled out the alternative suspect, the eyewitness failed to identify the alternative suspect in a photo lineup, undermining the reliability of their exculpatory statement.  *Id.*  That witness was unreliable for other reasons.  He was "high on crack cocaine and had consumed a significant amount of alcohol at the time of the murder."  *Id.* at 592.  And he gave "inconsistent statements regarding his prior knowledge of McNeill."  *Id.*  In contrast, the evidence exculpating Dillon is more reliable.  As discussed, the same witness who tentatively connected Dillon to the scene of the crime also observed details that ruled him out.  In addition, the documents from the Ravenna Arsenal and the butcher shop in Ohio gave Dillon a concrete alibi.

Finally, *McNeill* is different because the alternative suspect evidence at issue there was a single police report that identified both the alternative suspect and the reasons for excluding that suspect.  *McNeill*, 10 F.4th at 599.  The court held that *this particular report* was not favorable evidence.  *Id.*  By contrast, there are multiple pieces of evidence at issue here, some of which point toward Dillon as a potential culprit for the Fulton murders and some of which rule him out. Regardless, there is no reason to think the outcome in *McNeill* would have been different if the

evidence at issue had consisted of multiple reports instead of one.  While *McNeill* indicates that it is "helpful to evaluate each piece of evidence individually" when determining favorability, *id.* at 598, it does not require the Court to evaluate each piece of evidence in a vacuum, without considering its relationship to other evidence.  *Cf. id.* at 599 (considering several audio recordings as a group when determining favorability); *see also Coe*, 161 F.3d at 345 n.4 ("The information on [the alternative suspect] is only exculpatory if the *whole* truth about [the alternative suspect] is.").  Thus, the distinction between one piece of evidence and multiple pieces of evidence is irrelevant.  *McNeill* applies.

Other cases cited by Titus, such as *Hughbanks*, *Jamison*, *Gumm*, and *Bies*, are distinguishable because they do not involve alternative suspects who were investigated and cleared by the police.  It is one thing for a suspect to have sufficient connections to a crime to merit police investigation and disclosure of the suspect to the defendant.  The foregoing cases readily apply to those circumstances.  But *McNeill* indicates that a different rule applies where the police have conducted that investigation and then ruled out the suspect based on "substantial" exculpatory information gathered about the suspect.  Neither *Hughbanks*, *Jamison*, *Gumm*, nor *Bies* address the latter situation.

The Court acknowledges that a rule allowing police officers to withhold evidence of an alternative suspect based on the weight of the evidence for and against that suspect's culpability potentially "conflicts with the Supreme Court's directive that the criminal trial, as distinct from the prosecutor's private deliberations, be preserved as the chosen forum for ascertaining the truth about criminal accusations."  *McNeill*, 10 F.4th at 611 (Clay, J., dissenting) (quoting *Clark v. Warden*, 934 F.3d 483, 492 (6th Cir. 2019)).  Nevertheless, this Court is bound by *McNeill* and other Sixth Circuit cases holding that *Brady* does not automatically apply to all evidence of

alternative suspects considered by the police.  In particular, it does not apply to evidence of alternative suspects the police have eliminated based on substantial exculpatory evidence. Applying that precedent here, Defendants are not liable for withholding evidence or information pertaining to Dillon.

### 2. Qualified Immunity – Clearly Established Law

Even if *McNeill* is distinguishable from this case and does not dictate the outcome on the merits of the *Brady* claim, it supports a finding that Defendants are entitled to qualified immunity. In light of *McNeill* and *Coe*, it was not clearly established in 2002 that Defendants were required to turn over the evidence about Dillon.

Shortly before Titus's trial in 2002 (and shortly *after* Brown retired), the Sixth Circuit held that, while the government is not necessarily obligated to "turn over every last suspect considered in the course of an investigation," it must disclose suspects with "enough factors" tying them to the crime. *Jamison*, 291 F.3d at 390-91.  This holding clearly indicated that the government must disclose *some* of the alternative suspects police have considered during an investigation, but the reach of that holding was hardly clear.  The court's opinion did not articulate a clear distinction between alternative suspects with "enough factors" tying them to the crime and those without such factors.

More importantly, neither *Jamison* nor any other Sixth Circuit opinion before Titus's trial held that *Brady* applies to evidence of alternative suspects the government has investigated and eliminated.  In 2002, the only guidance on that point was *Coe*'s statement that *Brady* "would not apply" to alternative suspect evidence where police have "substantial exculpatory evidence" to exclude that suspect.  *Coe*, 161 F.3d at 345 n.4.  Although *Coe*'s statement was not binding law or central to its holding, it nevertheless pointed to a scenario where *Brady* would not require the police to disclose an alternative suspect.  *Jamison* did not address, let alone foreclose, that scenario.

Indeed, *McNeill* later adopted *Coe*'s statement as part of its reasoning.   If *Jamison* clearly established that the police must disclose all alternative suspects with some connection to the crime, including those the police have eliminated based on substantial evidence, then *McNeill* would have ignored *Coe*'s dicta and followed the rule in *Jamison*.   *Cf. McNeill*, 10 F.4th at 611 (Clay, J., dissenting) (arguing that the alternative suspect had a sufficient connection to the crime and was therefore favorable evidence under *Jamison*).   *McNeill* did not do so.   Instead, it relied on the logic proposed by *Coe*, just as any reasonable officer in Defendants' position could have done when assessing the law in 2002.

The Sixth Circuit employed similar reasoning in *Siggers v. Alex*, No. 22-1182,  2023 WL 5986603 (6th Cir. Sept. 12, 2023), holding that it was not clearly established in 1984 that *Brady* material includes "a statement implicating someone who was *cleared as a suspect of the crime*, but who might have been mistaken for a second suspect."  *Id.* at *5 (emphasis added).   The court agreed that "*Brady* fairly implies that some evidence of alternative suspects must be disclosed," but it disagreed that "*Brady* clearly established a general right as of 1984 to all evidence of alternative suspects."  *Id.* at 6.   Although *Moldowan* implied that police had a clearly established duty to disclose *some* alternative suspect evidence, the court in *Siggers* distinguished *Moldowan* because "[t]here was no evidence in *Moldowan* that the police investigation *had eliminated* any of the undisclosed persons as suspects, as there was here with respect to the suspect, Garland." *Siggers*, 2023 WL 5986603, at *6 n.7 (emphasis added).

Notably, *Siggers* examined the contours of clearly established law in light of the specific context of that case.   The court did not ask whether it was clearly established that (1) the police must disclose all material exculpatory evidence, or (2) the police must disclose all legitimate alternative suspects.   Instead, it "narrowed the issue to whether it was clearly established that a

'statement implicating someone *who was cleared as a suspect of the crime*, but who might have been mistaken for a second suspect, was *Brady* material'—and determined that was not clearly established." *Buehner v. City of Cleveland*, 788 F. Supp. 3d 827, 909 (N.D. Ohio 2025) (quoting *Siggers*, 2023 WL 5986603, at *5-6). In other words, "qualified immunity in this specific context appears to hinge, in part, on whether the alternate suspect was 'cleared as a suspect of the crime.'" *Id.* (quoting *Siggers*, 2023 WL 5986603, at *5). Thus, "if officers have investigated that alternate suspect and cleared them as a suspect, that would fall outside clearly established law requiring disclosure." *Id.* (cleaned up). Likewise, because the police in Kalamazoo investigated Dillon and discovered substantial evidence to clear him as a suspect, it was not clearly established in 1984 that *Brady* required Defendants to turn over the evidence pertaining to Dillon.

Titus's case differs from *Siggers* in that the relevant date for determining clearly established law here is 2002, not 1984. Defendants' *Brady* obligations continued up to and during Titus's trial in 2002.[9] But the only relevant legal opinion identified by the parties that issued between 1984 and Titus's trial is *Jamison*. As discussed, *Jamison* is distinguishable for the same reason that the Sixth Circuit distinguished *Moldowan*: there is no indication that the police in *Jamison* had eliminated the alternative suspect. Thus, *Jamison* did not clearly establish that Defendants were required to disclose the evidence regarding Dillon, whom Wiersema had eliminated based on substantial exculpatory evidence.

For similar reasons, Titus's reliance on *Bies* and *D'Ambrosio v. Bagley* is misplaced. Titus argues that these habeas cases held that the law regarding disclosure of alternative suspects was clearly established before 2002 because the petitioners in those cases challenged convictions for crimes committed before 2002. However, neither of those cases involved an alternative suspect

---

[9] Brown's obligations ceased when he retired in January 2002, a few months before Titus's trial.

who was eliminated by the police.  Moreover, neither of those opinions expressly addressed whether the law regarding disclosure of alternative suspects was clearly established in or before 2002.

In summary, as to the Dillon evidence, Titus has not met his burden of overcoming the defense of qualified immunity.  He has not shown that Defendants violated clearly established law. Consequently, Defendants are entitled to qualified immunity for Titus's claim that Werkema and Brown suppressed evidence about Dillon or suppressed the knowledge that the Nofzs selected Dillon in the Ohio lineup.

### C. Huffman Signed Statement

The other piece of evidence purportedly withheld by Brown and Werkema is the signed statement that Wiersema claims he took from Huffman when he interviewed her in 1990, wherein she claimed she saw Titus at her parents' house between 8:00 p.m. and 9:00 p.m.  That statement was consistent with her mother's account, but it contradicted Huffman's later statements to the police in 2002 and at Titus's trial.  She told Romanak in May 2002 that she saw Titus between 6:15 p.m. and 6:30 p.m., and she testified at trial that she saw Titus between 5:15 p.m. and 6:00 p.m.

#### 1. Favorability

The signed statement would have been favorable to Titus because it would have impeached the only eyewitness testimony placing Titus near the Fulton State Game Area close to the time that Bennett and Estes were killed.  *See Smith v. Cain*, 565 U.S. 73, 76 (2012) (evidence impeaching key witness was material under *Brady*).

#### 2. Apparent Favorability

Defendants argue there is no evidence that they were aware of the written Huffman statement, as there is no evidence of its existence apart from Wiersema's recent deposition

testimony.  Werkema does not recall seeing such a statement (Werkema Dep. 64), and Cinabro notes that Wiersema previously testified that such a statement did not exist.  At an evidentiary hearing in 2015, Wiersema testified that he did not take a written statement from Huffman. (3/27/2015 Evid. Hr'g Tr. 41-43, ECF No. 75-5.)

However, Wiersema's more recent testimony is sufficient to create a factual dispute about these issues.  He testified that he took this statement and that it would have been placed into the main investigative file held by the KCSO.  (Wiersema Dep. 172-73.)  As discussed above, the KCSO later provided the main investigative file to the cold-case team.  Consequently, a jury could infer that Werkema and Brown received that statement.  In other words, construing the foregoing evidence in the light most favorable to Titus, a reasonable jury could find that the written statement existed and that Werkema and Brown were aware of it.  *See Elkins v. Summit County*, 615 F.3d 671, 675 (6th Cir. 2010) (finding officers could have been aware of a memorandum where they did not contest its creation and, if mailed, they would have received it according to the department's usual practices); *Gillispie v. City of Miami Township*, No. 3:13-cv-416, 2020 WL 5629677 (S.D. Ohio Sept. 21, 2020) (finding officer could have been aware of police reports with exculpatory value where other officers testified to their existence and contents, and according to custom and procedure, those reports would have been part of the case file).

Although Wiersema's testimony has changed over time, the Court cannot disregard his more recent testimony by pointing to his prior inconsistent statements.  At the summary judgment stage, the Court cannot weigh the strength of Wiersema's testimony or evaluate his credibility. Instead, the Court must construe his conflicting statements in Titus's favor before granting summary judgment to Defendants, and in Defendants' favor before granting summary judgment to Titus.  Because of those conflicting statements, there is a genuine factual dispute about whether

the written statement existed and whether Werkema or Brown were aware of it.  Thus, neither party is entitled to summary judgment on those issues.

Construing the evidence in Titus's favor, if the statement existed and if Werkema and Brown were aware of it, a reasonable jury could also conclude that Werkema was aware of its exculpatory value as impeachment evidence.  A jury could conclude that Werkema would have known about Huffman's interview with Romanak in April or May 2002, in which Huffman asserted that she saw Titus between 6:15 p.m. and 6:30 p.m. (5/1/2002 Romanak Rep., PageID.3052.)  Based on this report, Werkema would have known before trial that Huffman placed Titus at the scene closer in time than any other eyewitness, contrary to her written statement and contrary to Titus's alibi, making the impeachment value of her written statement apparent.

However, Brown retired before Huffman's interview with Romanak.  There is no evidence he would have known that she had changed her story about the timing of Titus's arrival.  Thus, the impeachment value of the written statement would not have been apparent to him.  The Court cannot discern any other exculpatory value of that statement that would have been apparent to Brown before his retirement in January 2002.  A written statement placing Titus at Huffman's parents' home  at 8:00 p.m. (several hours after the murders occurred) does not tend to exculpate Titus on its own.  Indeed, it is consistent with the prosecution's theory that Titus killed Estes and Bennett between 4:30 p.m. and 5:30 p.m. when Titus and Driskell were separated from one another, and that Titus then rejoined Driskell in Battle Creek by 6:00 p.m. before returning home at around 7:00 p.m.  Accordingly, Brown is entitled to summary judgment on this issue, but not Werkema.

### 3. Suppression

As discussed above, evidence is suppressed from the defense if not made available to it and the evidence is wholly within the control of the government.  "There is no *Brady* violation

'where a defendant knew or should have known the essential facts permitting him to take advantage of any exculpatory information, or where the evidence is available . . . from another source,' because in such cases there is really nothing for the government to disclose." *Coe*, 161 F.3d at 344 (quoting *United States v. Clark,* 928 F.2d 733, 738 (6th Cir. 1991) (cleaned up)).

Defendants suggest that they are not liable for withholding a statement from Huffman because Titus's counsel could have interviewed Huffman. However, nothing in the materials turned over to Titus's counsel hinted at the existence of a written statement by Huffman that she saw Titus between 8:00 p.m. and 9:00 p.m. on the night of the murders. Wiersema's report from 1990 does not indicate that he asked her about seeing Titus that night, let alone that he took a written statement from her attesting to the timing of Titus's arrival. Moreover, interviewing Huffman in 2002 would not have produced a written statement from years earlier. Thus, the written statement was not available from another source and Titus did not possess the essential facts permitting him to take advantage of it. Thus, Defendants are not entitled to summary judgment on the suppression prong.

### 4. Materiality

The written statement would have impeached Huffman's trial testimony more strongly than Burnworth's testimony or than Huffman's statements to Romanak. The greater impeachment value of a signed statement arguably distinguishes this case from those in which the impeachment evidence was not material because it was merely cumulative of other inconsistent statements by a prosecution witness. *See, e.g.*, *Montgomery v. Bobby*, 654 F.3d 668, 681–82 (6th Cir. 2011) (en banc).

On the other hand, the Court must assess the materiality of evidence by looking at the entire trial record, *see Bies*, 775 F.3d at 399, which the parties have not provided. And nowhere do the

40

parties attempt to assess how Huffman's statement would have impacted the outcome of Titus's trial in light of the entire record.  Summary judgment is therefore denied on the materiality prong.

### 5. Defendants' Culpability

Defendants further argue that some level of culpability greater than negligence or simple possession of exculpatory information is necessary to hold them liable, such as intentional concealment, bad faith, or deliberate indifference.  (Cinabro Renewed Summ. J. Br. 22, ECF No. 133; Werkema Summ. J. Br. 29-30, ECF No. 108-1.)  They are partially correct.  The level of culpability necessary to find Defendants liable is awareness that the evidence withheld "could form a basis for exonerating the defendant."  *Marino*, 747 F.3d at 398 (quoting *Moldowan*, 578 F.3d at 388 n.14).  In other words, the evidence's exculpatory value must have been "apparent" to them. *Id.*

Defendants are wrong to suggest that something more is necessary, such as intentional concealment or bad faith.  *Moldowan* squarely held that police officers can be liable for withholding *Brady* material even if they do not act with an improper motive.  *Moldowan*, 578 F.3d at 378.  "[T]he critical issue . . . is the nature of the evidence that was withheld[,] . . . not the mental state of the government official who suppressed the evidence."  *Id.* at 384.  Bad faith may be relevant if police officers withhold evidence that was only "potentially useful," and its exculpatory value was not apparent.  *See United States v. Mooney*, 135 F.4th 486, 498 (6th Cir. 2025) (quoting *Arizona v. Youngblood*, 488 U.S. 51, 58 (1988)).  In such cases, the officers' bad faith conduct "indicate[s] that the evidence could form a basis for exonerating the defendant."  *Youngblood*, 488 U.S. at 58.  But the Sixth Circuit has repeatedly "rejected the proposition that an officer's *Brady* violation *requires* 'bad faith.'"  *Salter v. City of Detroit*, 133 F.4th 527, 536 (6th Cir. 2025) (emphasis added) (quoting *Clark*, 130 F.4th at 579).  Thus, Titus is not required to show bad faith or intentional concealment by Defendants.

Along similar lines, Werkema argues that government officials can only be liable for a constitutional violation based on their own misconduct, not the misconduct of others. *See Gibson v. Matthews*, 926 F.2d 532, 534–35 (6th Cir. 1991). He is correct, but nothing about that principle requires that the official have a particular state of mind to be liable for a *Brady* violation. *See Daniels v. Williams*, 474 U.S. 327, 329-30 (1986) ("[Section] 1983, unlike its criminal counterpart, 18 U.S.C. § 242, contains no state-of-mind requirement independent of that necessary to state a violation of the underlying constitutional right."). Here, the necessary state of mind is awareness of the evidence and of its exculpatory value. Bad faith is not necessary.

In addition, no authority supports Defendants' argument that they are not liable for suppressing a statement created by Wiersema. They suggest it is Wiersema's fault for not disclosing that statement to the prosecutor. However, officer liability for a *Brady* violation does not depend upon where the evidence or information originates. Under *Moldowan*, the officer is liable if he was aware of and suppressed material, favorable evidence that was not already disclosed to the prosecutor.

### 6. Hearsay

Defendants object that Wiersema's testimony about the contents of the Huffman statement is inadmissible hearsay. To the contrary, hearsay is an out-of-court statement "offered in evidence to prove the truth of the matter asserted." Fed. R. Evid. 801(c). Titus does not offer Wiersema's testimony to prove that Huffman saw Titus arrive at her parents' house between 8:00 p.m. and 9:00 p.m. on the night of the murders. Instead, he offers it to prove that Huffman made a statement that was inconsistent with her trial testimony, in order to impeach her credibility. When offered for that purpose, the hearsay rules do not apply.

42

### 7. Qualified Immunity

Defendants apparently argue they are entitled to qualified immunity with regard to the Huffman statement because the law was not clearly established that they were required to disclose evidence that they did not personally generate or solely possess. *Brady* does not apply to information available to the criminal defendant from other sources, but there is no genuine dispute that, if the Huffman statement existed, it was not available to Titus except through the police who were investigating his case. However, Defendants imply that they are entitled to qualified immunity if other police officers possessed the same information and did not disclose it to the prosecutor. If that is their argument, they are mistaken.

As an initial matter, it was clearly established in 2002 that a prosecutor's *Brady* obligations extended to impeachment evidence. *See Strickler*, 527 U.S. at 282 n.21 ("Our cases make clear that *Brady's* disclosure requirements extend to materials that, whatever their other characteristics, may be used to impeach a witness."). And according to *Moldowan*, it was clearly established as early as 1990 that police officers must comply with *Brady* by turning over potentially exculpatory evidence to the prosecutor's office. *Moldowan*, 578 F.3d at 381-82. *Moldowan* described that obligation as an "*unwavering* constitutional duty to preserve and ultimately disclose" material, exculpatory evidence, where its exculpatory value is apparent to the officer. *Id.* at 388 (emphasis in original).

Nothing in the Sixth Circuit's formulation of a police officer's *Brady* obligation, or the Supreme Court's formulation as applied to prosecutors, limits its scope to materials generated or solely possessed by that particular officer. To the contrary, the Supreme Court has long described *Brady* as imposing an "affirmative duty to disclose evidence favorable to a defendant." *Kyles*, 514 U.S. at 432. In 1999, it stated that this affirmative duty "encompasses evidence '*known only to police investigators* and not to the prosecutor.'" *Strickler*, 527 U.S. at 281 (quoting *Kyles*, 514

U.S. at 438) (emphasis added).  While the Supreme Court has not spoken to a police officer's *liability* for failing to disclose *Brady* materials, it clearly indicated before 2002 that *Brady* generally encompasses information *known* to police officers.

Similarly, when concluding that clearly established law extended *Brady*'s disclosure obligations to police officers, the Sixth Circuit cited precedent from other circuits before 2002 holding that "a police officer sometimes may be liable if he fails to apprise the prosecutor or a judicial officer of *known* exculpatory information."  *Moldowan*, 578 F.3d at 381 (emphasis added) (quoting *Brady v. Dill*, 187 F.3d 104, 114 (1st Cir. 1999)).  And a few months before Titus's trial, the Sixth Circuit indicated that *Brady* "extends to information in the possession of the law enforcement agency investigating the offense." *Jamison*, 291 F.3d at 385.  In short, it was clearly established by 2002 that Werkema and Brown had a duty to disclose favorable evidence known to them, whether or not they personally generated that information or other officers also possessed it.  Thus, they are not entitled to qualified immunity on this basis.

## IV. CONCLUSION

In summary, Defendants are entitled to summary judgment for Titus's claim that Werkema and Brown withheld evidence and information regarding Dillon as an alternative suspect. Defendants are not liable because the favorability of that evidence and information would not have been apparent in light of the substantial evidence excluding Dillon as a plausible suspect. Moreover, Defendants are entitled to qualified immunity for this claim because Titus has not shown that clearly established law required Werkema or Brown to turn over such evidence or information to the prosecutor.

In addition, Cinabro is entitled to summary judgment for Titus's claim that Brown withheld Huffman's written statement claiming that she saw Titus arrive at her parents' house between 8:00 p.m. and 9:00 p.m. on the night of the murders.  Even if the statement existed, its exculpatory value

would not have been apparent to Brown before he retired.  Consequently, the Court will dismiss Cinabro as a defendant.

But neither Titus nor Werkema is entitled to summary judgment for Titus's claim that Werkema withheld Huffman's written statement.  The evidence in the record creates a genuine factual dispute as to whether that statement existed and whether Werkema was aware of it.  If Werkema was aware of it, a jury could conclude that its exculpatory value as impeachment evidence would have been apparent to him.  The parties have not adequately briefed or demonstrated whether that statement is material, i.e., whether Titus's use of that statement during his trial could have had an outcome on the verdict, so the Court cannot decide that issue.  Moreover, construing the available evidence in Titus's favor, Werkema is not entitled to qualified immunity for this claim.

The Court will enter an order consistent with this Opinion.


Dated: November 20, 2025            /s/ Hala Y. Jarbou
                                    HALA Y. JARBOU
                                    CHIEF UNITED STATES DISTRICT JUDGE